No. 77,041

STATE OF KANSAS, *Appellee*, v. DONALD R. BARKSDALE, a/k/a DONALD R. GRIFFIN, *Appellant*.

(973 P.2d 165)

Opinion filed January 22, 1999.

Geary N. Gorup, of Render Kamas, L.C., of Wichita, argued the cause and was on the briefs for appellant.

Debra S. Peterson, assistant district attorney, argued the cause, and Nola Foulston, district attorney, and Carla J. Stovall, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Donald R. Barksdale, a/k/a Donald R. Griffin, was charged with and convicted of the murders of Hosea Davis III and Jennifer Forgie. Although occurring at different times, both charges were joined for trial. The defendant argues that the trial court erred in joining both charges for trial. He also contends that the admission of autopsy photographs as well as other testimony and instructional errors require reversal. We conclude that no reversible error occurred and affirm.

## The Murder of Hosea Davis III

On Tuesday, December 3, 1991, Daniel Marsh, a neighbor who occupied half of a duplex where Hosea Davis III lived, called the Wichita Police Department asking that an officer check on the welfare of Davis. Marsh had become suspicious when Davis did not have his outside lights on the night before, as Davis always had the outside lights on at night. Marsh had attempted to call Davis, but the phone was continually busy although Marsh heard no voices coming from the other half of the duplex. A call to the operator confirmed that there were no voices on the line.

Wichita police officers DeBerry and White, together with Marsh, entered the duplex. They discovered the naked body of Davis face down on the dining room floor partially covered by a bedspread. Davis had a telephone cord wrapped around his neck. A knife, alternately described as a carving knife or a letter opener, was found near the body. There was no sign of forced entry.

An autopsy revealed that Davis did not die from strangulation but from a blow to the head from a blunt instrument which caused a skull fracture. Other injuries included strangulation marks on the neck; a fractured hyoid bone; bruises on the upper left arm, right inguinal region, and above the upper left eyebrow; and a deterioration of skin on the legs, which was apparently caused from heat. An investigation indicated the possibility of semen on the victim and semen swabs were collected from the base of the scrotum, buttocks, and anal area.

Davis' residence was neatly arranged except for the bedroom which had been ransacked. Marsh stated that on Sunday night, December 1, he had heard noises from Davis' side of the duplex which indicated to him that Davis was entertaining someone in what he considered to be a sexual act. Marsh had not seen or heard from Davis for a few days. Davis' address book was found at his residence. One of the names in the book was that of the defendant.

At trial, the State introduced the testimony of Kenneth Speer, a correctional officer at the Kansas State Penitentiary. Speer testified that the defendant and Davis had both been assigned to his cell house in 1985 and were together almost every day. On February 17, 1985, Speer discovered Davis and the defendant in the defendant's bunk together, naked from the waist down.

Davis' father, the Reverend Hosea Davis II, testified that he last saw his son on November 30, when Davis was cleaning the church. The Reverend stated that Davis introduced him to a friend who was helping clean up and told him that the friend's name was Don Barksdale. Although he was unable to identify the defendant in a lineup, the Reverend did identify the defendant at the preliminary hearing as the person to whom he had been introduced to that day. The Reverend thought it strange that Davis did not come to church on Sunday because Davis was the church organist. The Reverend also testified that he had eaten Thanksgiving dinner at Davis' house and a friend of Davis was there on Thanksgiving.

The DNA testing of the semen swabs was a source of controversy. William Hamm, a forensics specialist in DNA analysis for the Kansas Bureau of Investigation, testified that there were insufficient samples to perform a Restriction Fragment Length Poly-

morphism test on the items. Harold Deadman, a forensic DNA analyst with the Federal Bureau of Investigation, examined the swabs using a Polymerase Chain Reaction (PCR) test. Deadman testified that the semen swabs showed the presence of two secretions and that the defendant could not be excluded as a contributor and that only one person in 1,000 would produce the result found in the test. However, the defendant's expert, Dean Stetler, Chairman of the Genetics Department at the University of Kansas, interpreted the PCR test results as actually excluding the defendant.

### The Murder of Jennifer Forgie

On August 6, 1992, Jennifer Forgie was called in to work at Best Cleaners, 2630 East Central in Wichita. Jennifer usually worked at one of the other stores but was called to the East Central store by Lonna Flores because another employee was sick. Flores worked in the corporate office of Best Cleaners, which was attached to the cleaners.

Flores testified that normally when a customer picks up clothes at the cleaners, the salesperson finds the customer's ticket, gets the clothes, puts the clothes on a pickup rack, accepts the money, and then validates the ticket and puts it on a spindle to show that the clothes have been picked up. Flores also stated that the cash register tape records the invoice numbers of the clothing picked up as well as the time it was picked up. On the day in question, the tape would have been off 1 hour because it did not adjust for daylight savings time.

Flores stated that during the day she spent one break with Forgie, who told her that she was looking forward to getting her paycheck and that she only hoped she would be around to spend it. Their break was interrupted when a bell rang signifying that a customer had walked through the door. Flores went back to the corporate office and called her sister on the telephone. She thought the time was around 4:20 to 4:25 p.m. While she was on the telephone, she noticed a black car pull up and then leave.

Sometime between 4:15 and 4:30 p.m., Willette Martin and her brother, William Phillips, arrived at the cleaners to pick up clothes. They were in Phillips' dark brown Lincoln. Willette Martin entered

the cleaners and saw no one there. There were dark clothes hanging on the pickup rack. She waited approximately 3 minutes and then called out to see if anyone was there. A male voice from the back of the cleaners told her that the machine was broken and that she should come back in 20 minutes. Martin left the cleaners and told her brother of the situation. Phillips told Martin that he did not think the machine needed to be working just to pick up clothes, and he went into the cleaners. Phillips testified that when he found no one out front, he rang the bell at the desk. He then saw a dark-complected black man with a knife in his hand. Phillips would later identify the defendant as the person with the knife, although he had earlier picked out a different person in a photographic lineup, and had also identified another person on the day of the murder. The individual told him to get out. He left the cleaners, ran back to the car, and told Martin that they needed to leave because the store was being robbed and they needed to find a phone. As they exited the parking lot, they noticed a van pulling up. Lonna Flores, in the office, also noticed what she described as a beige van pull up.

Diane Allison testified that she arrived at the cleaners between 4:35 and 4:45 p.m. in her brown van. She noticed a long, black car parked there and saw a person come out of the cleaners and get into the car. She went into the cleaners and no one was at the front desk. She noticed two bags on the pickup rack. One of the bags had the tag "Griffin" on it.

Allison testified that she heard a gurgling noise. Curious, she walked behind the counter and saw Jennifer Forgie lying face down. The gurgling noise was Forgie's breathing. Allison immediately went to the phone at the desk and dialed 911 at which time a male voice behind her told her to put the phone down and leave. She carefully walked out the door and then got in her van and began backing up. As she was doing so, she saw a white car pull in. She yelled at the car's occupant to leave and call the police because someone in the cleaners was injured. Allison then drove to the first house she saw and dialed 911. Lonna Flores also noticed the beige van leave and a white car pull in.

Darlene Moore-Ford stated that she went to the cleaners in her white car. As she was getting out of the car a woman yelled to her to call the police. She began to back out when she saw a person calmly walking out of the cleaners with a bag of clothes over his shoulder. She could not see the person's face. Thinking there might have just been an altercation with a dissatisfied customer, Moore-Ford left and went to another store, returning later to find the police at the cleaners.

Lonna Flores, in the office, saw a white car pull away, and then saw a black male leave the store carrying bags of clothes. She could not see his face. Soon after, Flores saw a red blazer pull in and two men with guns jumped out and entered the cleaners. She later learned these two were detectives with the Wichita Police Department. They were immediately followed by several police officers.

D.K. Bryant, an undercover officer with the Wichita Police Department, testified that he and his partner responded to a dispatch call at the cleaners. Upon entering the cleaners, Bryant discovered the body of Jennifer Forgie. Forgie's hands were tied behind her back with a cord from the clothes conveyor which had been brought up in front of her neck. An autopsy revealed that Forgie had sustained a blunt trauma injury to the head, had been strangled, and had also been stabbed multiple times about the head and body. Any of these wounds separately or all of them collectively could have caused Forgie's death.

On a table not far from Forgie's body, the police found a heavy piece of iron covered with grease. They theorized that this might be responsible for the blunt trauma. Some time after the police searched the building, a cleaning employee found a knife on a table in the back of the store. However, the knife was thrown away by an employee.

Forgie's purse was unopened. The store safe was open and a money bag containing $180 was on top of the safe. A bag of cleaned clothing was hanging from a vacuum cleaner in the hall. The tag said "Griffin, C." A bag of clothing on the pickup rack was registered to the defendant. Diane Allison testified as a result of a police photograph that there was less clothing on the pickup rack than

when she was at the cleaners. The total theft of money at the cleaners was in the amount of approximately $300.

Based on the bag of clothes on the pickup rack, police interviewed the defendant. Detective Mitch Mervosh went to the residence indicated on the bag and spoke to both the defendant and the defendant's girlfriend, Deborah Marks. The defendant told Mervosh that he had earlier gone to an automotive repair shop, came back home and talked to Marks, and then gone to Best Cleaners. The defendant stated that he was at the cleaners at approximately 4:30 p.m. and was waited on by a red-headed female. He stated that he paid $40 to $45 for his cleaning but did not get a receipt. He further stated that as he was leaving the cleaners, he saw a large, dark-colored car in the parking lot and noticed a brown van pulling in.

The officers asked the defendant whether he might have left a bag of laundry at the cleaners. The defendant stated that he must have mistakenly not taken it with him. The defendant stated that he had walked to the cleaners.

The cash register tape from the cleaners did not show that the defendant had picked up his laundry. The last transaction recorded on the tape was at 3:45 p.m. for $2.33 and $15.57. A "no sale" transaction was recorded at 4:31 p.m. There were no receipts for the defendant under the name Griffin, Barksdale, or Marks in the box to signify that the laundry had been picked up.

Deborah Marks told the officers that the defendant had come home from the cleaners at around 5 p.m. and had immediately started washing clothes. The defendant told officers that on his trip to the cleaners he had been wearing the same shirt he had on as well as some jeans which he had put in the washer.

Both cases remained unsolved until the fall of 1994, at which time the Sedgwick County District Attorney's office received a telephone call from Joe Campbell. Campbell, who was incarcerated for armed robbery at the time, told the office that he had information on two homicides and wanted the office to speak to the parole board on his behalf.

Campbell stated that he had been a friend of the defendant for 25 years. According to Campbell, he and the defendant had been

talking while they were both incarcerated at Lansing in May 1993, and Campbell brought up the subject of Hosea Davis. Campbell stated that he knew the defendant had been "Hosea's man" in prison. The defendant told Campbell that Davis was dead.

According to Campbell, the defendant told him that the defendant had been at Davis' house and Davis had shown him 2 ounces of cocaine and $1500 in cash. The defendant began thinking of ways to get the cocaine and money from Davis. Davis and the defendant began having anal sex, and the defendant took the phone cord out of the wall and began trying to strangle Davis. However, the phone cord broke. Davis asked the defendant what he was doing, and the defendant told Davis that he was just "bullshitting around." They continued to have sex, whereupon the defendant again took up the cord and strangled Davis. The defendant then wiped his prints from the area, took the money and cocaine, and left.

Campbell testified that he asked the defendant whether he had killed anybody else in his life and the defendant stated to him that he had killed a girl at a dry cleaners on Central. Campbell stated that the defendant told him he went into the cleaners to pick up clothes and when the girl went back to get the clothes, he decided to rob the place. The defendant told Campbell that he had a knife with him and he held the knife on the girl while she took money out of the cash register.

The defendant told Campbell that he thought about raping the girl because "her ass was soft." However, he decided just to tie her up and leave. She began crying and the defendant started stabbing her. Campbell said the defendant told him the knife broke when he stabbed the girl in the head.

The defendant then heard someone come through the front door. The defendant saw a lady standing there and the lady called out. The defendant told her to come back later. He looked out and saw the lady drive away in a Lincoln. He then left and went home. Upon arriving home he immediately washed his clothes. He put on other clothes and was going to go buy drugs, but there were too many police in the vicinity.

## Pretrial and Trial

The defendant was charged with both murders. Prior to trial, the defendant filed a motion to sever on the grounds that the crimes were not similar. The court denied the motion to sever but did prevent the State from introducing into evidence the defendant's prior conviction for voluntary manslaughter in 1978.

At trial, the State presented the testimony of Nola Foulston, Sedgwick County District Attorney, with regard to the circumstances of Joe Campbell's testimony and any promises made for that testimony. Foulston testified that after hearing Campbell's information, she investigated to find out if he might be a credible witness. She stated that she discovered Campbell had testified on behalf of the State in a prior case and had been determined to be a reliable witness in that case. The defendant objected to that statement, alleging that it was hearsay in any event. The State then asked Foulston whether she did anything else to determine Campbell's credibility which drew an objection from the defendant. The objection was sustained.

In an instructions conference, the defendant requested an instruction be given to the jury on informant testimony. The court refused to give the instruction, saying that it did not apply under the facts of the case. The jury found the defendant guilty of both charges. He was sentenced under the Habitual Criminal Act to a double life sentence on each count to run consecutively.

## Severance

The defendant argues that the murder charges were improperly joined, that evidence of either homicide was inadmissible to prove the other, and the evidence of each homicide was more prejudicial than probative in the proof of the other. The State argues that the charges were properly joined under the provisions of K.S.A. 22-3202(1):

"Two or more crimes may be charged against a defendant in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or

transactions connected together or constituting parts of a common scheme or plan."

The crimes charged were not based on the same act or transaction and did not constitute a common scheme or plan. However, the statutory basis for joinder in this case was that the two crimes were "of the same or similar character." K.S.A. 22-3202(1).

Our standard of review on the question of joinder under K.S.A. 22-3202(1) is well established. Whether a defendant will be tried on separate charges in a single trial is a matter within the discretion of the trial court, and the trial court's decision will not be disturbed on appeal unless there is a clear showing of abuse of discretion. *State v. Cromwell*, 253 Kan. 495, 511, 856 P.2d 1299 (1993). If reasonable persons could differ about the propriety of the trial court's decision, there is no abuse of discretion. 253 Kan. at 511.

This court has on numerous occasions throughout its history addressed the subject of whether crimes are of the same or similar character so as to permit their joinder. In *State v. Hodges*, 45 Kan. 389, 392, 26 Pac. 676 (1891), we stated:

"Several separate and distinct felonies may be charged in separate counts of one and the same information, where all of the offenses charged are of the same general character, requiring the same mode of trial, the same kind of evidence, and the same kind of punishment. [Citations omitted.] The defendant may be tried upon all the several counts of the information at one and the same time, and in one trial, but all this rests in the sound judicial discretion of the trial court."

This standard has been reiterated many times by this court. See *State v. Bagby*, 231 Kan. 176, 178, 642 P.2d 993 (1982); *State v. Gander*, 220 Kan. 88, 90, 551 P.2d 797 (1976); *State v. Brown*, 181 Kan. 375, 381-82, 312 P.2d 832 (1957); *State v. Powell*, 120 Kan. 772, 784, 245 Pac. 128 (1926); *State v. Warner*, 60 Kan. 94, 98, 55 Pac. 342 (1898).

In *State v. Toelkes*, 139 Kan. 682, 684, 33 P.2d 317 (1934), we stated:

"So far as the joinder of separate offenses in the same information is concerned, the test is: Are the charges of the same general nature and will the joinder deprive the defendant of an advantage in the trial, or are they incongruous and repugnant in character and will they operate to deprive the defendant of some legal advantage? We see no reason why felonies and misdemeanors may not be joined where

they are kindred in nature, as well as different felonies of like nature prosecuted in separate counts."

However, in *State v. Thompson*, 139 Kan. 59, 61-62, 29 P.2d 1101 (1934), we warned against relying solely on generalities when considering the propriety of joinder:

"That offenses must be of the same general character is not always a sound test of joinder. In this instance the two crimes charged were of the same general character, in that they both involved force and violence to the person. That, however, would not necessarily be sufficient. To illustrate: As the culmination of a long-standing quarrel about a line fence, a farmer kills his neighbor. He goes to town, and the same afternoon, while in an excited frame of mind, he becomes involved in an altercation about a business matter, and makes an assault with some kind of a deadly weapon with intent to kill. While the offenses are of the same general character, there should be separate informations and separate trials. The only reason this is so is, there would inevitably be some jumbling of the two cases at the trial, which would tend to prevent that concentrated consideration of each case which is indispensable in matters of such gravity."

The defendant argues that the two murders were not similar in that (1) the Davis murder carried with it an additional underlying felony of aggravated criminal sodomy that the Forgie murder did not; (2) Davis was a personal friend of the defendant, while Forgie was a stranger; (3) strangulation was the cause of Forgie's death but not the cause of death in the Davis murder; (4) a knife was used in the Forgie murder, not a blunt instrument as used in the Davis murder; and (5) the same evidence was not necessary in order to prove both crimes and with the exception of Joe Campbell, none of the witnesses were the same for both cases.

The question is whether the trial court's determination that the crimes were similar and, thus, subject to joinder was a decision with which no reasonable person would agree. In both cases, robbery was the motive. The manner in which each victim was killed was substantially similar. Davis was strangled and received a blunt trauma to the head. Forgie was also strangled and received a blunt trauma to the head as well as stab wounds. Although the defendant claims that strangulation was not the method of Davis' actual death, it is clear from the evidence that both victims had been strangled. Blunt trauma could have been the method of both deaths as it was unclear whether Forgie died as the result of strangulation, stab

wounds, blunt trauma, or a combination of the three. Both victims were found face down and tied with cords. The two murders were committed within 9 months of one another in the same general neighborhood in Wichita. While it is true that only one witness, Joe Campbell, was common to both cases, it is also true that both cases generally required the same mode of trial and the same kind of evidence, and resulted in the same kind of punishment.

The facts and nature of the charges in this case are similar to those in other cases where we found joinder to be proper. In *Cromwell*, we found joinder to be proper where both victims were mature women who lived alone and knew the defendant despite the fact that 4 years had passed between the murders. See 253 Kan. at 511. In *State v. Hill*, 257 Kan. 774, 780, 895 P.2d 1238 (1995), we found no abuse of discretion in joining four cases where (1) the incidents occurred in the same neighborhood within a span of around a month; (2) the attacker was similarly dressed in two of the incidents; (3) two of the incidents involved rape, while in the other two incidents the attacker was seen by the victim while he was still some distance away which might have altered his plans; (4) similar items were taken from each residence; and (5) in each case the victims were instructed to roll over on their stomachs and the attacker placed a pillow on their heads. In *Bagby*, we found joinder proper when in each instance aggravated burglary preceded some sexual act such as rape and aggravated sodomy and the victims described the assailant as a black man with a screwdriver or an ice pick. 231 Kan. at 178.

Under the requirements of K.S.A. 22-3202(1), and our prior case law from *Hodges* to the present, the crimes with which the defendant was charged are not only sufficiently factually similar but also sufficiently similar in mode of trial and kind of evidence required, as well as punishment prescribed, that we cannot say that no reasonable person would agree with their joinder.

Nevertheless, the defendant argues that we should adopt a different test, *viz.*, that joinder for trial of separate offenses may be granted only where the other separate crimes charged and tried in the same trial would be admissible under K.S.A. 60-455 as prior bad acts or crimes. However, this court has not so limited the

joinder rule. We have commented that where the evidence of crimes joined for trial would have been admissible under K.S.A. 60-455 in a separate prosecution, the defendant is unable to demonstrate any prejudice when the crimes are tried in a single trial. See *Cromwell*, 253 Kan. at 509-11. At the same time, Kansas case law and the provisions of K.S.A. 22-3202(1) make it clear that joinder is not dependent upon the other crimes being joined meeting the admissibility test set forth in K.S.A. 60-455. See K.S.A. 22-3202(1); *Bagby*, 231 Kan. at 178-79; *Brown*, 181 Kan. at 382-83; *Toelkes*, 139 Kan. at 684.

While the defendant argues that it was error in this case to allow evidence of each separate homicide because it was inadmissible under K.S.A. 60-455, and because such evidence was more prejudicial than probative, this assertion lacks merit. In *Cromwell*, we held that where separate but similar criminal charges are joined in a single trial, evidence material to each crime is admissible independent of K.S.A. 60-455. See 253 Kan. at 509. In the case at hand, the jury was specifically instructed:

"Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it; uninfluenced by your decision as to any other charge. . . ."

The defendant's contention that the prejudicial value of the evidence of one crime outweighs its probative value begs the question and fails to recognize that evidence of both crimes was admissible independent of K.S.A. 60-455. We conclude that the trial court did not abuse its discretion in joining the two homicide charges.

## Photographs

The defendant argues that the trial court erred in allowing the introduction of 54 gruesome and shocking autopsy photographs. The defendant contends that the photographs were gruesome, repetitious, unnecessarily cumulative, and not probative.

On the outset, it should be noted that although the defendant now complains of the 54 autopsy and crime scene photographs, at trial he objected only to exhibits 62-65, 126-136, and 146-49. Further, only with regard to exhibits 127, 128, and 129 did the defendant object on the basis that they were unnecessarily gruesome

and inflammatory. The remaining photographs were objected to only on the basis of relevance. It is well settled that a timely and specific objection to the admission of evidence at trial must be made in order to preserve that issue for appeal. *State v. Holbrook*, 261 Kan. 635, 643, 932 P.2d 958 (1997).

The law of this state on the admission of photographs in a homicide trial is well established:

> "The admission of photographs in a homicide case is a matter within the trial court's discretion, and the court's ruling will not be disturbed on appeal absent a showing of abuse of that discretion. *State v. Reed*, 256 Kan. 547, 557, 886 P.2d 854 (1994). While photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. 256 Kan. at 557.

> "We have held that special care should be taken in admitting photographs taken after a pathologist has intervened in order that the evidence not be more gruesome than necessary. See *State v. Prouse*, 244 Kan. 292, Syl. 1, 767 P.2d 1308 (1989). In *State v. Boyd*, 216 Kan. 373, 377-78, 532 P.2d 1064 (1975), we held that the trial court abused its discretion in admitting a photograph of the victim 'laid out like a disemboweled beef in a packing plant,' where such a photograph was repetitious and cause of death was not in dispute. However, it is well settled that photographs which serve to illustrate the nature or extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death. *State v. Spears*, 246 Kan. 283, 286, 788 P.2d 261 (1990)." *State v. Carr*, 265 Kan. 608, 623, 963 P.2d 421 (1998).

We have considered all the photographs and as a whole they do not appear to be particularly gruesome or shocking. All the photographs are relevant in showing the injuries to the victims as well as the crime scenes where the bodies were located. In none of the photographs is there the kind of intervention by a pathologist that we decried in *State v. Boyd*, 216 Kan. 373, 377-78, 532 P.2d 1064 (1975). The most invasive photograph in this regard is Exhibit 149 which shows the interior view of Forgie's skull. However, even this photograph is not horribly gruesome and is relevant to show the damage done by the skull fracture.

We conclude that the defendant has failed to establish abuse of discretion in the admission of photographs admitted in evidence.

All were relevant, all served to illustrate the nature or extent of the wounds inflicted, and all tended to corroborate the evidence as to the cause of death.

## Credibility of Witness

After Joe Campbell testified, the State called Nola Foulston, the Sedgwick County District Attorney, as a witness for the prosecution. The defendant did not object to her being called as a witness. She was asked to recount her steps in obtaining the testimony of Campbell. Again, the defendant did not object. She testified that one of her steps was to contact Leavenworth County because Campbell had previously testified on behalf of the State in connection with a case there and had been determined to be a reliable witness in that case. The defendant objected to the characterization of the testimony as well as to the nature of the testimony as hearsay. The objection was overruled. Later, the State asked Foulston whether she made any further contacts to confirm the credibility of Campbell. The defendant objected on the basis that it was an attempt to bolster Campbell's credibility. The trial court sustained the objection and the witness was not permitted to respond.

The defendant argues that the district court erred in allowing Foulston to vouch for the credibility of Campbell. He contends that the statements of Foulston on the stand were improper to the same degree that they would have been had they been uttered during closing argument.

We have held that where a prosecuting attorney testifies in criminal proceedings, reversible prejudice results from the attorney's testimony where the attorney actively participates in the prosecution and is a primary witness or when the attorney participates in the prosecution and in testimony states his or her opinion as to the guilt of the accused. *State v. Washington*, 229 Kan. 47, 61, 622 P.2d 986 (1981). We have also held that an expert witness may not pass on the weight or credibility of a witness. See *State v. Arrington*, 251 Kan. 747, 752-53, 840 P.2d 477 (1992); see also *State v. Steadman*, 253 Kan. 297, 304, 855 P.2d 919 (1993) (in a criminal trial, police officers may not testify that in their opinion a defendant was guilty).

However, in this case, neither situation actually occurred. Foulston recounted the steps that she took in determining whether to call Campbell as a witness in the defendant's case. While Foulston's statement regarding the credibility of Campbell as a witness in a previous case was error, the defendant's objection to the testimony was on the basis of hearsay. As we noted above, a timely and specific objection to the admission of evidence at trial must be made in order to preserve that issue for appeal. See *Holbrook*, 261 Kan. at 643. We note that the trial court sustained a later objection by the defendant to a question from the State that might be seen as an attempt to bolster Campbell's credibility. The issue that the defendant would have us resolve was not preserved by a timely and specific objection at trial.

Informant Instruction

In a related issue, the defendant argues that especially in light of the testimony by Foulston concerning Campbell's credibility, the defendant should have been entitled to an instruction regarding the testimony of an informant who testifies for a benefit. The defendant requested such an instruction but the trial court refused to give it concluding that Campbell did not qualify as an informant.

The instruction requested by the defendant was that contained in PIK Crim. 3d 52.18-A, which states:

"You should consider with caution the testimony of an informant who, in exchange for benefits from the State, acts as an agent for the State in obtaining evidence against a defendant, if that testimony is not supported by other evidence."

Recently, in *State v. Kuykendall*, 264 Kan. 647, 957 P.2d 1112 (1998), we examined the circumstances under which an informant instruction should be given. In *Kuykendall*, a friend of the defendant offered to trade information that the defendant told him regarding a murder in exchange for the State informing federal authorities of his cooperation in the hope that this would influence an unrelated federal case. 264 Kan. at 652-53. We concluded that the defendant was not entitled to the requested instruction. We noted that an informant is an undisclosed person who confidentially discloses material information of a law violation, thereby sup-

plying a lead to officers for their investigation. This definition did not include a person who supplies information after being interviewed by police officers or who gives information as a witness during the course of an investigation. 264 Kan. at 654. We also noted that the alleged informant in *Kuykendall* was not acting as an agent for the State when the evidence was obtained from the defendant but was merely relating what the defendant told him. 264 Kan. at 654.

The situation in this case is identical to that in *Kuykendall*. Campbell was not acting as an informant for the State at the time he collected the information and, therefore, his testimony is not of the character that requires a cautionary instruction.

Nevertheless, the defendant argues that our decisions in *Kuykendall* and previous cases should be reexamined. According to his argument, if we adhere to the definition of an informant as an "undisclosed person who confidentially discloses material information," the pattern instruction becomes useless. If an informant is undisclosed, that informant by definition never testifies. If the informant testifies, then the informant is disclosed and, thus, would not meet the narrow definition of an "informant" for which a cautionary instruction is required. Thus, according to the defendant, such an instruction can never be given.

This court developed its definition of an "informant" in *State v. Abel*, 261 Kan. 331, 336, 932 P.2d 952 (1997), *overruled on other grounds State v. Mathenia*, 262 Kan. 890, 900, 942 P.2d 624 (1997). The definition quoted from Black's Law Dictionary 780 (6th ed. 1990) appears to apply only to undisclosed informants who would by definition not testify. However, the crux of the definition is that an informant is a person who acts as an agent for the State in procuring information. In this respect, a person may be an informant whether he or she is disclosed or undisclosed. See PIK Crim. 3d 52.18-A. Whether disclosed or undisclosed, in order to qualify as an informant, the person must act as an agent for the State in procuring information. Campbell was not a person who acted as an agent for the State in procuring information and was therefore not an informant under the definition adopted by this court in *Abel*. The trial court did not err in refusing to give the cautionary in-

struction on informant testimony. Rather, the court correctly gave the general instruction regarding the credibility of witnesses contained in PIK Crim. 3d 52.09, which informed the jury that it was to determine the weight and credit to be given to the testimony of each witness and that it could use its common knowledge and expertise in so determining.

### Admissibility of testimony

The defendant's final contention is that the district court erred in allowing Campbell's testimony because it was obtained in return for promises by the State to contact the parole board on his behalf. He argues that the rationale of the United States Court of Appeals in *United States v. Singleton*, 144 F.3d 1343 (10th Cir. 1998), *overruled upon rehearing en banc* (1999), should apply.

As a threshold issue, it should be noted that this issue was not raised in the trial court. Issues not presented to the trial court may not be raised for the first time on appeal. *State v. Gardner*, 264 Kan. 95, 106, 955 P.2d 1199 (1998).

Even if this court decides to address the issue, *Singleton* is not applicable. First, as noted above, *Singleton* has been overruled upon rehearing by the 10th Circuit Court of Appeals. Second, its rationale does not apply. In *Singleton*, a panel of the Tenth Circuit Court of Appeals found that Section 201(c)(2) of Title 18 of the United States Code prohibits giving, offering, or promising anything of value to a witness for or because of his testimony and that this section applies to prosecuting attorneys. As a result, the court suppressed the testimony of a government witness to whom prosecutors had promised leniency in exchange for testimony. However, in so holding, the court noted: "We emphasize that the rule we apply today rests in no way on the Constitution; it is a creature solely of statute." 144 F.3d at 1361.

Kansas has no statute comparable to 18 U.S.C. § 201(c)(2) (1994). While the defendant is free to argue that such a statute should be adopted, there is no constitutional prohibition against the testimony of a witness who receives benefits in exchange for testimony. In this case, the defendant had the opportunity to cross-examine Campbell as to the benefits he received in exchange for

testifying. The jury was, therefore, aware of those benefits and could take them into account in assessing Campbell's credibility. The trial court did not err in allowing Campbell to testify.

Affirmed.