IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36995-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JULIAN ALMAGUER, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Julian Almaguer appeals his conviction for forgery arising from his attempt to cash a fraudulent check. We reverse and grant Almaguer a new trial because of prejudice resulting from the introduction of inadmissible hearsay and the State's attorney's reference to facts not in evidence during closing statement.

FACTS

We garner our facts from trial testimony.

On June 14, 2016, a gentleman entered a Spokane Moneytree to cash a check. The State contends this gentleman was the accused, Julian Almaguer, but Almaguer denies this. We refer to the gentleman as the "presenter of the check" or the "presenter." The

check was purportedly written by Becky Nance to "Julian Almaguer" for $156. The presenter handed the check and an identification card of Julian Almaguer to a Moneytree teller, Sara Scott. Scott observed alterations on the check. At the request of Scott, the presenter signed the name of Julian Almaguer to the back of the check. Scott deemed the check, the signature, or both to be illegitimate. The presenter told Scott that he received the check for work performed for Nance.

A concerned Sara Scott announced to the presenter of the check that she would contact Becky Nance to verify the check. The presenter responded that Nance had a disconnected phone. Scott, however, found Nance's listed phone number, called her, and spoke with her. Based on Scott's phone call to Nance, the writing on the check, and Almaguer's identification card, Scott concluded that the presenter tendered a fraudulent check and that Julian Almaguer was the presenter. She copied the check and Almaguer's identification card and informed the presenter that Moneytree would give the copy of the check to law enforcement. The presenter of the check left the store. Sara Scott sent a written report of the incident with the copy of the check and driver's license to Crime Check.

On June 21, 2016, Officer Michele Kernkamp of the Spokane Police Department reviewed Sara Scott's report and began investigating the presentment of the check. Officer Kernkamp reviewed the Moneytree's surveillance footage, which showed the presenter's interaction with Scott. Kernkamp determined that the individual depicted in

2

the footage was the same individual pictured on the copy of Julian Almaguer's driver's license.

PROCEDURE

The State of Washington charged Julian Almaguer with one count of forgery. As previously mentioned, Almaguer denied that he was the individual who presented the fraudulent check. Trial took place on May 8, 2019. Almaguer did not testify at trial.

During the State's direct examination of Officer Michele Kernkamp during trial, Kernkamp identified Julian Almaguer as the individual she saw on Moneytree's surveillance footage and on the identification card presented to Sara Scott:

> Q. Okay. And so based on that, do you believe Mr.—that individual is in the courtroom today?
> A. I do, yes.
> Q. Where is he sitting, just for the record?
> A. Just to your right.
> Q. What is he wearing?
> A. Gray sweatshirt or type of sweatshirt.
> MR. JOLSTEAD [the State's attorney]: Your Honor, I'd ask the record to reflect that she's identified Mr. Almaguer in the courtroom.
> THE COURT: The record would reflect the same.

Report of Proceedings (RP) at 134-35. Almaguer did not object to the trial court's comment. The State did not offer as an exhibit or show the surveillance video.

During trial, Sara Scott also identified Julian Almaguer as the individual who attempted to cash the fraudulent check on June 14, 2016.

> Q. Okay. And is that person in the courtroom today?
> A. Yes.

> Q. Okay.  Have you had the opportunity to see Mr. Almaguer today?
> A. Yes.
> Q. Okay.  And do you believe that's the same individual?
> A. Yes.
> Q. Okay.  And where is Mr. Almaguer sitting in the courtroom?
> A. Right there.
> Q. Okay.
> MR. JOLSTEAD: Your Honor, I'd ask the record to reflect that she has identified Mr. Almaguer.
> THE COURT: The record will reflect the same.

RP at 153.  Almaguer did not object to the trial court's confirmation by Scott of Almaguer as the man who presented the check.

On questioning by the State, Sara Scott, over Julian Almaguer's objection, explained why she concluded that the check Almaguer presented to her was fraudulent:

> Q. Okay.  And so based on talking to [Becky Nance], based on your concerns about the check and based on Mr. Almaguer saying you weren't going to be able to get ahold of her, what was your opinion about this check?
> MR. WHALEY [defense counsel]: Objection, your Honor.  It would require her to rely upon what would be hearsay in this case, the check person that she called.
> THE COURT: Any response from the State?
> MR. JOLSTEAD: I'm asking her based on her investigation what is her opinion of this check.
> MR. WHALEY: Which is partially based upon evidence which is not before the Court and which isn't going to be before the Court if that person doesn't testify.
> THE COURT: Overruled.  She can answer.
> Q. (BY MR. JOLSTEAD) So, based on your investigation, what was your opinion concerning this check?
> A. Based on my investigation, I concluded that it was a fraudulent check.

RP at 154-55.

4

During trial, Sara Scott also testified that Julian Almaguer wore a black flat-billed hat when he presented the check at Moneytree.

> Q. Let me stop you really quick here.  So what—do you remember what Mr. Almaguer was *wearing that day*?
> A. No.
> Q. So you wrote a report on this, correct?
> A. Yes.
> Q. Okay.  Would looking at that report refresh your memory?
> A. Yes.
> [Scott reviewed the report]
> . . . .
> Q. So, Ms. Scott, did that refresh your memory as to what Mr. Almaguer was *wearing that day*?
> A. Yes.
> Q. What was he wearing?
> A. A black flat bill, basketball shorts, and a big sweatshirt.
> Q. A black flat bill, what is that?
> A. A black flat-billed hat.

RP at 149-50 (emphasis added).

The State contends that, during trial, Julian Almaguer carried a hat in his hands and placed the hat on counsel's table on multiple occasions.  Nevertheless, the State did not ask Sara Scott to identify the hat possessed by Almaguer in the courtroom as the hat he donned when he entered Moneytree.  The State did not seek to introduce the hat as an exhibit.

The trial court instructed the jury that, to convict Julian Almaguer of forgery, the State needed to prove beyond a reasonable doubt that he "possessed, offered, disposed of or put off as true a written instrument which had been falsely made, completed or

5

altered." Clerk's Papers (CP) at 21; *See* RCW 9A.60.020(1)(a). The court also delivered

the standard jury instruction that informs the jury to "disregard any evidence which either

is not admitted or which may be stricken by the Court." RP at 116.

During the State's rebuttal closing argument, the State's attorney referenced Julian

Almaguer's hat:

> One of the things that's also interesting is the fact that—and Mr.
> Whaley touched on this—is that Ms. [Scott], while she was up here
> speaking and talking about what Mr. Almaguer had worn that day, and she
> said that he had a black flat-billed cap. And the defendant in court has had
> possession of *that exact same hat*, whether or not you've noticed it.

RP at 200 (emphasis added). Almaguer objected to the State's comment. The trial court

sustained Almaguer's objection. The court did not, however, provide a curative

instruction after sustaining Almaguer's objection. Almaguer did not then move for

mistrial.

The jury found Julian Almaguer guilty of forgery.

Julian Almaguer moved for a new trial. He asserted prosecutorial misconduct

based on the State's attorney's mentioning, during summation, Almaguer's hat. The trial

court denied Almaguer's motion. In its oral ruling, the trial court noted that Almaguer

brought the hat to the courtroom, the hat was only one piece of evidence, the prosecuting

attorney's mention of the hat was no different from the attorney stating that Sara Scott

identified Almaguer as the culprit, the court earlier instructed the jury that argument of

the lawyer did not constitute evidence, and presumably the hat rested on the table when

6

the State's attorney's mentioned the hat in closing.

The trial court entered written findings of fact in response to the motion for new trial. Finding of fact 3 relates to Julian Almaguer's hat and reads:

> That during closing arguments the State made mention of a Black billed hat which was in the possession of the defendant during trial and which had been discussed during presentation of evidence.

CP at 61. The trial court also entered some conclusions of law:

> XI. That the hat was discussed at trial very specifically.
> XII. That on [page.] 36 of the trial transcript the State questioned [Ms. Scott] as to what the defendant was wearing.
> —That [Ms. Scott] responded that he was wearing a black flat bill.
> —That the State asked, "a black flat billed what?"
> —That [Ms. Scott] responded, "a black flat billed hat".
> XIII. That the hat was a fact that had been put in evidence by the State during its direct examination.
> . . . .
> XV. That the State made its comments, regarding the black hat that was present with the defendant during trial, within the same instance of pointing out the defendant's features; and that these comments were in response to defense comments regarding how features were not the same.
> XVI. That the State was not arguing facts not in evidence as the hat had been a fact that had been submitted into evidence.
> . . . .
> XIX. That the hat was evidence and it was not error to discuss the hat in closing arguments.
> XX. That the hat was only one piece of evidence that the jury saw, and that the defendant chose to bring it into the courtroom; that it is not often that defendants bring evidence into the courtroom.

CP at 62-63.

## LAW AND ANALYSIS

On appeal, Julian Almaguer assigns three errors from the trial. First, the trial court

erroneously allowed Moneytree employee Sara Scott to rely on hearsay evidence when opining that the check presented to her by the presenter was forged. Second, the trial judge improperly asserted himself as a witness when confirming for the record that Sara Scott identified Almaguer as the forger. Third, the State engaged in prosecutorial misconduct when arguing to the jury that a hat brought by Almaguer to court was the same hat mentioned by witness Sara Scott as being worn by the forger who entered Moneytree. Almaguer adds that cumulative error prejudiced him and requires a new trial. Julian Almaguer also contends that the sentencing court committed error when calculating his offender score. Because we find reversible trial error, we do not address any purported sentencing error.

Hearsay Evidence

*Issue 1: Whether the trial court committed error when allowing Sara Scott to testify to an opinion based on hearsay?*

*Answer 1: Yes.*

Julian Almaguer asserts that the trial court should have sustained his objection to Sara Scott's testimony regarding her conclusion that the check presented to Moneytree was fraudulent. He emphasizes that Scott based her conclusion of forgery on her out-of-court conversation with the check's maker, Becky Nance. The State responds that the trial court did not allow introduction of hearsay because Scott proffered none of Nance's statements.

8

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ER 801(c). Hearsay is inadmissible unless an exception or exclusion applies. ER 802. "Inadmissible evidence is not made admissible by allowing the substance of a testifying witness's evidence to incorporate out-of-court statements made by a declarant who does not testify." *State v. Martinez*, 105 Wn. App. 775, 782, 20 P.3d 1062 (2001), *overruled on other grounds by State v. Rangel-Reyes*, 119 Wn. App. 494, 81 P.3d 157 (2003).

In *State v. Johnson*, 61 Wn. App. 539, 811 P.2d 687 (1991), a police officer testified that he had reason to know that defendant Jody Johnson engaged in drug trafficking. When testifying, the officer relied on an affidavit containing the contents of an informant's statement. The trial court overruled Johnson's hearsay objection to the testimony. This court held that the challenged testimony was hearsay. We followed the rule that, when the inescapable inference from the testimony is that a nontestifying witness has furnished the police with evidence of the defendant's guilt, the testimony is hearsay notwithstanding that the testifying witness does not repeat the actual statements made by the non-testifying witness. The *Johnson* court concluded that the police officer's testimony created this inescapable inference.

Similarly, in *State v. Martinez*, 105 Wn. App. 775 (2001), this court reversed a conviction because a police officer testified to his knowledge of how an informant obtained his drugs. The officer's knowledge came from talking to an informant. We

9

rejected the State's argument that the officer's knowledge was admissible because the officer did not repeat the comments of the informant. We reasoned that the State should not be permitted to circumvent the hearsay rule.

In *State v. Hudlow*, 182 Wn. App. 266, 281, 331 P.3d 90 (2014), this court held that the State's rephrasing of questions to avoid direct quotations of what an informant told a law enforcement officer "still only echoed what [the officer] may have heard the informant utter." We reversed another conviction based, in part, on hearsay evidence.

Sara Scott's testimony parallels the testimony of law enforcement officers in these two Washington decisions. Scott testified that she spoke with Becky Nance. The State then asked: "And so based on talking to [Becky Nance], based on your concerns about the check and based on Mr. Almaguer saying you weren't going to be able to get ahold of her, what was your opinion about this check?" RP at 154-55. After the court overruled a hearsay objection, Scott testified that, based on her investigation, the presented check was fraudulent. The State did not extract from Scott any of Nance's statements, but the jury would necessarily infer that Nance told Scott that the check was illegitimate. If Nance had indicated otherwise, Scott would not have concluded that the check was fraudulent. Thus, the trial court should have sustained Julian Almaguer's hearsay objection. We later address whether the inadmissible hearsay testimony created reversible error.

Judicial Comment on the Evidence

*Issue 2: Whether the trial court committed error when confirming that witnesses*

10

*Sara Scott and Michele Kernkamp pointed to Julian Almaguer in the courtroom when the State asked each to identify the gentleman who presented the forged check to Moneytree?*

*Answer 2: We decline to address this question.*

When asked during trial by the State to identify Julian Almaguer, witnesses Officer Michele Kernkamp and Sara Scott respectively pointed to Julian Almaguer as he sat at counsel table. On each occasion, the prosecuting attorney asked the trial court to confirm each witness's fingering of Almaguer. The trial court so confirmed without objection from trial defense counsel.

On appeal, Julian Almaguer contends that whether the witnesses identified him was an issue of fact for the jury, not the trial court, to resolve. According to Almaguer, the trial court impermissibly commented on the evidence by its confirmation. The State responds that the trial court did not comment on the evidence, but rather stated a fact that had occurred inside the courtroom.

Under the Washington Constitution:

> Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law.

CONST. art. IV, § 16. Pursuant to the Washington State Constitution, judges may not comment on evidence presented at trial. *State v. Deal*, 128 Wn.2d 693, 703, 911 P.2d 996 (1996).

11

In *State v. Jones*, 171 Wn. App. 52, 54, 286 P.3d 83 (2012), Division Two of this court ruled that the trial court committed no error when confirming that the arresting officer identified the defendant Lorin Jones in court. Julian Almaguer distinguishes *Jones* in that Lorin Jones, contrary to Almaguer, did not assert an identity defense.

Our panel is split as to whether to follow Division Two's lead in *State v. Jones*. Because the assignment of error to the trial court's confirmation of the identification is not outcome determinative, we decline to address the assignment.

Prosecutorial Misconduct and a Black Flat-Bill Hat

*Issue 3: Whether the trial court erred by entering finding of fact 3 and conclusions of law 11-13, 15-16, and 19-20, all of which relate to Julian Almaguer's flat-billed hat?*

*Answer 3: The trial court erred by entering the finding of fact and some of the conclusions of law.*

We now turn to Julian Almaguer's assignment of error that the State's attorney engaged in prejudicial misconduct when arguing to the jury that Almaguer brought to court the same black flat-bill hat, to which Sara Scott testified as being worn by the presenter of the check inside the Moneytree. Before addressing the merits of this question, we need to answer two questions underlying the arguments of the parties in support of the assignment of error and in opposition to the assignment: (1) whether any of the findings of fact and conclusions of law entered by the trial court are erroneous; and (2) whether, as argued by the State, its attorney's testimony and argument about the hat

12

concerned demeanor evidence and a prosecuting attorney's comment on the defendant's demeanor? Our answers to these questions impact our response to whether prosecutorial misconduct occurred.

Julian Almaguer contends that the record does not support the trial court's finding of fact 3. Finding of fact 3 mentions that, during closing arguments, the State referenced a black billed hat, which Julian Almaguer possessed during trial and which a witness mentioned during testimony. We agree that the State mentioned, during summation, that Julian Almaguer brought a hat to court, but the record does not confirm the accuracy of the State's comment. The trial record nowhere mentions the presence of any hat, let alone a witness or counsel giving a description of the hat. Sara Scott testified that Almaguer wore a black flat-billed hat during his entry into Moneytree. She did not testify that Almaguer was wearing or had a black hat in his possession during trial. If the trial court meant that *some* black hat was mentioned during presentation of evidence, then the record supports the finding. But any finding that Scott's testimony mentioned the hat's presence in the courtroom is mistaken.

The trial court's conclusions of law included statements that the hat was discussed during trial "very specifically," that Sara Scott testified that Julian Almaguer wore a black flat-bill hat when inside the Moneytree, that the State introduced into evidence the fact that Almaguer wore a hat when he entered Moneytree, that the State's attorney told the jury about the hat after defense counsel argued that Almaguer's features were not the

13

same as the forger, that the prosecutor commented about Almaguer bringing the hat to court at the same time that the prosecuting attorney commented on Almaguer's features, that the jury saw Almaguer's hat because he brought the hat into the courtroom, and that the hat was in evidence and thus commenting about the hat in closing was not error. Some of these conclusions of law may be more in the nature of a finding of fact. We disagree with the conclusions that the jury saw the hat. Nothing in the trial record confirms the presence of the hat, let alone any member of the jury seeing the hat. Assuming the trial court concluded that Sara Scott testified that the hat Almaguer brought to court was the same hat that he wore in the Moneytree, the record does not support this conclusion either. Assuming that the trial court justified the prosecutor referencing the hat because defense counsel asserted that Almaguer did not meet the feature of the forger, we also disagree. A hat is unrelated to a person's features.

We agree with Julian Almaguer that the evidence does not support finding of fact 3 and that finding of fact 3 and the other parts of the record do not support conclusions of law XIII, XVI, XIX, and XX.

*Issue 4: Whether the hat constituted demeanor evidence?*

*Answer 4: No.*

In response to Julian Almaguer's contention that the prosecution committed misconduct by mentioning, during closing argument, Almaguer's bringing to court the same hat worn by the presenter, the State contends that the hat comprised demeanor

14

evidence that constituted fair game during closing.  We now address the narrow question

of whether the wearing of a hat or the identity of that hat constitutes demeanor evidence.

The Washington Supreme Court, in *State v. Barry*, 183 Wn.2d 297, 352 P.3d 161

(2015), defined "demeanor" for purposes of trial.  The court, while relying on

dictionaries, wrote:

> *Webster's* defines "demeanor" as "behavior toward others: outward
> manner: CONDUCT" or, alternatively, "BEARING, MIEN: facial
> appearance."  Webster's Third New International Dictionary 599 (2002).
> *The American Heritage Dictionary* provides a similar definition—"[t]he
> way in which a person behaves; deportment"—and directs readers to the
> entry for "bearing" for a list of synonyms.  The American Heritage
> Dictionary of the English Language 496 (3d ed.1994).  Other suggested
> synonyms include "behavior," Roget's II The New Thesaurus 299
> (expanded ed.1997), as well as "manner" and "comportment."  The
> Random House Dictionary of the English Language 529 (2d ed.1987).

*State v. Barry*, 183 Wn.2d 297, 308 (2015) (some capitalization omitted) (alteration in

original) (footnote omitted).  Clothing or accessories worn by a person do not match any

of the definitions.

We question whether the prosecution may reference for the jury the demeanor of

the accused during the trial when the accused does not testify.  Although courts likely

lack an ability to enforce the proscription, we doubt whether the jury may consider the

demeanor of a non-testifying defendant when adjudging guilt or innocence.  So even

assuming the presence of a hat constituted "demeanor" evidence, the State's argument

probably fails anyway since Julian Almaguer did not testify.  In *State v. Barry*, 183

Wn.2d 297 (2015), the Washington Supreme Court faced this very question, but declined

to answer because the defendant did not object to reference to his demeanor and the court

found no prejudice. The Supreme Court warned the State, however, to avoid inviting the

jury to consider a non-testifying defendant's demeanor.

> *Issue 5: Whether the prosecuting attorney engaged in misconduct when arguing to*
> *the jury that Julian Almaguer brought to court the same hat worn by the presenter and*
> *when the presence of the hat in the courtroom was not mentioned by any witness?*

> *Answer 5: Yes.*

Julian Almaguer argues that the State committed prejudicial prosecutorial

misconduct when mentioning his hat during closing rebuttal. According to Almaguer, the

State's attorney thereby expressed her personal opinion that the hat in the courtroom was

the same hat as the one worn by the culprit inside Moneytree. Julian Almaguer frames

the issue in terms of whether the trial court should have granted a new trial. We address

the question of prosecutorial misconduct directly and later discuss any prejudice. We

note that Almaguer objected to the prosecuting attorney's reference to the hat at the time

of the utterance, although Almaguer did not then ask for a curative instruction or a

mistrial.

To resolve a claim of prosecutorial misconduct, we first inquire whether the

prosecutor made improper comments. *State v. Lindsay*, 180 Wn.2d 423, 431, 326 P.3d

125 (2014). Julian Almaguer bears the burden of proving that the prosecuting attorney's

16

remarks were improper. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011).

Criminal defendants have a constitutional right to a fair trial by jury. U.S. CONST. amend. VI, XIV; WASH. CONST. art. I., § 3, 21-22. A jury's verdict must be based on the evidence developed at the trial. *Turner v. Louisiana*, 379 U.S. 466, 472, 85 S. Ct. 546, 13 L. Ed .2d 424 (1965). The State commits error when, during summation, it submits evidence to the jury not admitted at trial. *In re Personal Restraint of Glasmann*, 175 Wn.2d 696, 705, 286 P.3d 673 (2012).

The prosecutor's reference to the hat violated other principles. The State's attorney expressed her opinion that the hat in the courtroom was the "exact same hat, whether or not you've noticed it" that Julian Almaguer allegedly wore at the time of the incident. RP at 200. The prosecutor purported to speak of her own percipient knowledge. The prosecuting attorney inserted herself as a witness into the case. The prosecutor suggested that her perception of the hat confirmed the guilt of Julian Almaguer.

A prosecuting attorney testifying at trial is disfavored and can be reversible error. *United States v. Torres*, 503 F.2d 1120, 1126 (2d Cir. 1974); *State v. Sierra*, 337 S.C. 368, 523 S.E.2d 187, 191 (Ct. App. 1999); *State v. Barksdale*, 266 Kan. 498, 973 P.2d 165, 174-75 (1999). A prosecutor should avoid expressing his or her personal opinion on a defendant's guilt. *In Re Personal Restraint of Glasmann*, 175 Wn.2d 696, 706-07 (2012).

Prejudice

*Issue 6: Whether cumulative error deprived Julian Almaguer of a fair trial?*

*Answer 6: Yes.*

Julian Almaguer argues that the cumulative effect of the errors alleged above resulted in an unfair trial. The State concedes no error, but responds that none of the alleged errors individually or collectively prejudiced Almaguer. The cumulative error doctrine "may warrant reversal, even if each error standing alone would otherwise be considered harmless." *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

The jury faced two factual questions. First, was Julian Almaguer the gentleman who presented the check to Sara Scott at the Moneytree? Second, was that check forged and fraudulent? The State needed to prove both facts beyond a reasonable doubt. The prosecuting attorney's improper reference to the black hat impacted the jury's deliberation as to the first question. Sara Scott's impermissible hearsay testimony affected the jury's decision as to the second question. We separate the two errors, beginning with the black flat-billed hat argument, for purposes of analysis of prejudice before we address their cumulative effect.

To prevail on appeal on a claim of prosecutorial misconduct when the defense objected below, the accused must show that the prosecuting attorney's comments were prejudicial. *State v. Warren*, 165 Wn.2d 17, 26, 195 P.3d 940 (2008); *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007) *abrogated on other grounds by State v. Gregory*,

192 Wn.2d 1, 427 P.3d 621 (2018). If the defense failed to object, the reviewing court decides in part whether a curative instruction could have remedied any prejudice. *State v. Loughbom*, 196 Wn.2d 64, 74, 470 P.3d 499 (2020); *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012). The efficacy of a curative instruction plays no role in determining prejudice when the defense objected at trial.

Consideration of any material by a jury not properly admitted as evidence vitiates a verdict when the court concludes that defendant suffered prejudice. *In re Personal Restraint of Glasmann*, 175 Wn.2d 696, 705 (2012). When a prosecutor's improper argument directly violates a constitutional right, the constitutional harmless error standard applies. *State v. Espey*, 184 Wn. App. 360, 369, 336 P.3d 1178 (2014). "A constitutional error is harmless only if the reviewing court is convinced beyond a reasonable doubt that any reasonable jury would reach the same result absent the error and where the untainted evidence is so overwhelming it necessarily leads to a finding of guilt." *State v. Burke*, 163 Wn.2d 204, 222, 181 P.3d 1 (2008).

On the one hand, Sara Scott procured identification from the presenter and that identification was a card with a picture of Julian Almaguer thereon. She then compared the photograph identification to the gentleman before her and confirmed the two matched. She copied the identification card. Sara Scott identified Julian Almaguer in the courtroom. Surveillance video captured the gentleman presenter. Officer Kernkamp

confirmed that the video pictured Julian Almaguer. Almaguer presented no evidence to the contrary.

On the other hand, Officer Michele Kernkamp's and Sara Scott's identifications of Julian Almaguer in court took place nearly three years after Almaguer allegedly committed forgery. The surveillance footage depicting Almaguer as the presenter was not introduced as evidence.

Julian Almaguer suffered some prejudice by the State's attorney's reference to the black hat. We might not consider that prejudice to alone demand a reversal and new trial. Nevertheless, we add that harm to the prejudice resulting from hearsay testimony when concluding cumulative error demands reversal.

If a trial court erroneously admits evidence, reversal is proper only if the error prejudiced the defendant. *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). An error is prejudicial if, within reasonable probabilities, the trial's outcome would have been materially affected absent the error. *State v. Bourgeois*, 133 Wn.2d at 403.

We deem the admission of the hearsay testimony through Sara Scott to constitute prejudicial error even on its own. To convict Julian Almaguer of forgery, the jury needed to prove beyond a reasonable doubt that he "possessed, offered, disposed of or put off as true a written instrument which had been falsely made, completed or altered." CP at 21. The only testimony presented by the State as to the forgery came through Sara Scott's

20

opinion of the check being fraudulent.  Yet, Scott based her opinion on a conversation with Becky Nance, the purported maker of the check.  The questions posed by the State to Scott confirmed that Scott based her opinion on a conversation with Nance.  The State presented no testimony from Becky Nance that she did not issue the check to Julian Almaguer.  Although Scott also based her opinion on the altered look of the check, the State likely could not prove the fraudulent nature of the check beyond a reasonable doubt without Scott's reliance on Becky Nance's hearsay comment.

CONCLUSION

We reverse Julian Almaguer's conviction for forgery and remand for a new trial.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Staab, J.

21