No. 84,606

STATE OF KANSAS, *Appellee*, v. MICHAEL A. BROWN, *Appellant*.

(37 P.3d 31)

Opinion filed December 14, 2001.

*Mary Curtis*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Michael A. Russell*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Michael A. Brown appeals his jury conviction of premeditated first-degree murder and his sentence to a hard 40 term of imprisonment.

On December 22, 1998, several friends and a woman named Tanya Yokum spent the evening with Pat Painter in the living room of his small house in Kansas City, Kansas. The friends were defendant, Lennon Moye, and Brian Hicks. Painter and the others drank beer and smoked marijuana. All but Hicks, who had sold crack cocaine to the others, smoked cocaine also. Painter accepted some clothes from defendant in trade for a $20 rock of crack cocaine. Drugs were sold to other people who came to the door that night.

All five people slept overnight in Painter's living room, where there was a space heater. Because there was no gas service to the house, Painter nailed a blanket over the doorway into the bedroom in an effort to keep the living room warm while they slept. When drug customers came to the door after Hicks went to sleep, Painter would take their money, get the drugs from Hicks, and send the customers on their way.

When Painter awoke at approximately 7 a.m. on December 23, defendant was standing over Hicks and hitting him with the hammer that had been used to nail up the blanket. Defendant looked over at Painter and continued hitting Hicks. According to Painter, Moye jumped up and tried to wrestle the hammer away from defendant. Neither Moye nor defendant had a gun. They struggled for several minutes before Moye was able to get the upper hand. Moye got Hicks' gun, which had been in Hicks' pocket as he slept. Painter and Tanya left the house. Painter ran down the street to Hicks' mother's house and woke his sister.

When Moye awoke, defendant was standing over Hicks and hitting him in the head with a hammer. Moye said that Hicks remained on top of a dresser where he had slept during the night. Moye testified that defendant had Moye's gun in his hand. Defendant turned the gun on Moye and told him he was being robbed. Meanwhile, Hicks was trying to get to his feet. Moye threw money and drugs from his pockets at defendant. As defendant was working to get the gun unjammed, Moye pleaded with defendant

to let him take Hicks to the hospital. Defendant said they were all going to die. Then defendant went out the front door and immediately came back in. He went back to the still conscious Hicks and delivered one more blow with the hammer. The final blow was so forceful that the hammer sank into Hicks' skull. Moye tackled defendant, they wrestled for the gun, and Moye got it away. Moye then found some hair clippers to hit defendant with.

When the police arrived at Painter's house, an ambulance already was leaving with Hicks. Inside the house Moye, with electric hair clippers in his hand, was holding defendant down. Defendant was lying face down on the floor with a hammer in his hand.

Police found three guns in the house. One was a black handgun, which was lying on the floor near Moye and defendant. It was jammed.

In Hicks' clothing, medical personnel found a ziplock bag containing approximately 25 to 30 rocks of crack cocaine. At the hospital, the only money found on Hicks were some coins. Painter claimed that Hicks had two or three thousand dollars on him before the fight broke out. In Painter's house, police found 19 baggies of suspected marijuana in a jacket pocket. No large amounts of cash were found at the house. Bills totaling $35 were scattered around the living room floor.

On December 24, defendant gave a statement to police in which he claimed that he struck Hicks in self-defense. Defendant gave police this account: He went to Painter's house to buy marijuana and Hicks opened the door for him. Painter, Moye, and a woman he did not know were sleeping in the living room. When defendant pulled out his money to pay for the marijuana, Hicks, with a gun lying nearby, told defendant to hand over all his money. When defendant refused, Hicks hit defendant twice with the butt of the gun. Defendant spied the hammer and grabbed it. Defendant hit Hicks in the head with the hammer. As Hicks was falling back, he tried to fire a gun at defendant, but the gun jammed. Fearing for his life, defendant continued hitting Hicks with the hammer. Moye jumped up, began fighting with defendant, and took the hammer from him.

Hicks died as a result of blunt trauma to his head. The wounds to his head were in pairs, which were consistent with blows from the claw end of the hammer. Hicks had no defensive injuries. In the pathologist/coroner's opinion, the absence of defensive wounds indicated that Hicks was unable to ward off blows due to sleep, lack of consciousness, or being restrained.

The jury was instructed on self-defense. It convicted defendant of the premeditated first-degree murder of Hicks and acquitted defendant of an aggravated robbery of Moye.

We first consider whether the trial court erred in responding in writing to a question asked by the jury. The manner and extent of a trial court's response to a jury request for further information rests in the trial court's discretion. *State v. Sperry*, 267 Kan. 287, 311, 978 P.2d 933 (1999). The trial court received the following written question from the deliberating jury: "What is the definition of premeditation? in laymen terms." The trial court responded in writing: "Please refer to the instruction which defines 'premeditation.' That is the best definition I can give you." The trial court's referring the jury to an instruction that defines the term in question is approved standard procedure for responding to a jury's request for a definition. See *Sperry*, 267 Kan. at 311.

Brown contends, however, that the response was inappropriate in this case due to an alleged inadequacy of the pattern instruction (PIK Crim. 3d 56.04[b]) defining "premeditation." His argument has no place in this appeal where there was no objection to the pattern instruction given. See K.S.A. 2000 Supp. 22-3414(3). Moreover, in *State v. Jamison*, 269 Kan. 564, 573, 7 P.3d 1204 (2000), a majority of this court reaffirmed the PIK Crim. 3d 56.04(b) definition of premeditation.

Brown also argues that the trial court's response to the question without having him present violated both his statutory and constitutional Sixth Amendment right to be present at all stages of his trial. K.S.A. 22-3420(3) provides that once the jury has begun deliberating, any question from the jury concerning the law or evidence pertaining to the case should be answered in open court in the defendant's presence. Likewise, K.S.A. 2000 Supp. 22-3405

and the Sixth Amendment require that a defendant be present at every critical stage of the trial.

In *State v. Bell*, 266 Kan. 896, 975 P.2d 239 (1999), the identical issue was raised. There, the trial court's response to a jury question during deliberations was not made in the defendant's presence and over his counsel's objection. We noted that both the Kansas statutes and the Sixth Amendment require the defendant's presence at all critical stages of a trial. We concluded that Bell's statutory and constitutional right to be present was violated. However, this court applied the harmless error rule and concluded the error was harmless. That rule provides: " 'An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. [Citations omitted.] Thus, before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. [Citation omitted.]' *Crease v. State*, 252 Kan. 326, 334, 845 P.2d 27 (1992) (quoting *State v. White*, 246 Kan. 28, 37, 785 P.2d 950, *aff'd as modified* 246 Kan. 393, 789 P.2d 1175 [1990]." *Bell*, 266 Kan. at 920.

In this case, the jury's question was a straightforward question of law, and the response given by the trial judge to the jury's inquiry was correct as a matter of law. There is no reason to think that input from defendant could, would, or should have caused the trial judge to give a different response to the jury. Defendant's not being present when the trial court made its response had little, if any, likelihood of changing the verdict. We conclude it was harmless error.

Brown's appellate counsel also argues that the trial court's response violated defendant's right to a fair and impartial jury. As already discussed, the response referred the jury to an approved definition of premeditation. Defendant claims that he was deprived of due process because the trial court did not make a transcribable record of responding to the jury question and denied effective assistance of appellate counsel, whose briefing of the issue allegedly was hampered by the lack of a transcript. Brown's counsel cites *State v. Lumbrera*, 252 Kan. 54, 73, 845 P.2d 609 (1992), which

does not support his claim. With no discussion of constitutional rights, the court stated: "Closing arguments, in criminal cases particularly, should be of record. We conclude it was error not to have the closing arguments of record herein. We need not determine the extent of prejudice resulting therefrom as we are reversing on the basis of cumulative error." 252 Kan. at 73. The issue in the present case involves nothing more than the trial court's referring the jury to the instructions. It is not a controversy over closing arguments or any other portion of trial in which the words spoken by counsel might be determinative of the issue. In this case, the jury's question and the trial judge's response are in the record. Moreover, we know from a post-trial addition to the record, signed by the prosecuting attorney, Brown's defense counsel, and the trial judge, that defense counsel was present with the judge in chambers, discussed the appropriate response, and had no objections. There is no merit to defendant's argument.

Brown next argues that there was not sufficient evidence to support the conviction. When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Jasper*, 269 Kan. 649, 655, 8 P.3d 708 (2000). In support of Brown's contention that there was a failure of proof that he killed Hicks with premeditation, he asserts that the State's supporting testimony either was speculative or was not credible.

Defendant urges the court to consider as an indication of his lack of premeditation that the weapon he used in killing Hicks was a hammer lying at hand, rather than a weapon that defendant brought into the house. Evidence that defendant did not take a weapon with him into the house might rule out any notion that he went to Painter's with the intention of killing someone there. It has no bearing, however, on what defendant thought while he spent a number of hours in the house with the victim.

Defendant also directs the court's attention to his statement to police in which he said that he was being robbed by Hicks and that Hicks hit him with the butt of a gun. However, the court's task is

to review the evidence in the light most favorable to the State. Here, there was evidence of premeditation that is favorable to the prosecution, and it is the measure of sufficiency. There was evidence from eyewitnesses that Hicks did not appear to have moved from where he had slept before defendant began hitting him in the head with a hammer. There also was evidence from the autopsy of a complete absence of defensive injuries. In the pathologist's opinion, the absence of defensive injuries to a victim who died from hammer blows to the head indicated that the victim was unable to ward off the blows. Whatever prevented Hicks from putting his hands up to protect himself need not be identified in order for the factfinder to draw a reasonable inference that defendant did not act from provocation. Furthermore, there was evidence that the final blow was delivered after defendant left the house and then returned to hit Hicks once more. With a lack of provocation and a helpless victim, a rational factfinder could have found beyond reasonable doubt that the killing was premeditated.

Defendant next complains that the trial court failed to give PIK Crim. 3d 52.18-A, which instructs jurors to consider with caution the testimony of an informant. Defendant did not ask the trial court to give the instruction. Even if he had requested an informant instruction, the trial court would have been correct to refuse to give it because there was no informant, within the meaning of the pattern instruction, who testified in the trial of this case.

In *State v. Barksdale*, 266 Kan. 498, 973 P.2d 165 (1999), the court examined recent case law on the qualifications of an informant for purposes of PIK Crim. 3d 52.18-A. It concluded that "the crux of the definition is that an informant is a person who acts as an agent for the State in procuring information." 266 Kan. at 514.

Defendant concedes that the witnesses in this case are not informants as defined in *Barksdale*. He also concedes that in *State v. Conley*, 270 Kan. 18, 24-25, 11 P.3d 1147 (2000), the court followed *Barksdale* in finding no error in the trial court's not giving the informant pattern instruction with regard to Conley's former cellmate, who had written to authorities offering information in exchange for benefits. Nonetheless, defendant would distinguish the present case on the ground that the witnesses—Painter, in

particular, agreed to cooperate with the police in the hopes of some help with his outstanding warrants—and refused to give information without some benefit. The asserted refusal to talk without gaining some benefit seems to be what defendant views as the distinguishing feature. There is no substantive difference, however, between Conley's cellmate conditioning his offer of information on personal advantage and Painter likewise conditioning his cooperation. In neither instance was the person acting as an agent of the State at the time he collected or gained the information. 270 Kan. at 25. There is no merit to this argument.

Finally, Brown challenges his hard 40 sentence. At the outset, defendant complains that the State did not give notice that it intended to request a hard 40 sentence. A notice of intent by the State, which was required before 1994, is no longer necessary. Compare L. 1994, ch. 341, § 6 with L. 1990, ch. 99, § 4.

Defendant also claims as a preliminary matter that the trial court failed to make a record of its findings with regard to the hard 40 sentence. The completed sentencing journal entry of judgment form, though sketchy, would seem to be an adequate record in the circumstances. It satisfies the statutory requirement in K.S.A. 2000 Supp. 21-4635(c): "The court shall designate, in writing, the statutory aggravating circumstances which it found." The sentencing judge noted his findings of aggravating and mitigating circumstances. He found that the statutory aggravating circumstances were that defendant knowingly or purposely killed or created a great risk of death to more than one person and that the crime was committed in an especially heinous, atrocious, or cruel manner. See K.S.A. 2000 Supp. 21-4636(b) and (f). He credited defendant's not having a significant criminal history as a mitigating circumstance.

Next, defendant argues that there is not sufficient evidence to support either aggravating circumstance.

Especially heinous, atrocious, or cruel manner. Defendant's position is that the evidence does not show that Hicks suffered serious mental anguish or serious physical abuse. Defendant was sentenced on August 13, 1999. On July 1, 1999, an amendment to K.S.A. 21-4636 became effective that enlarged the type of conduct

the legislature would consider sufficient for a finding that a defendant killed the victim in an especially heinous, atrocious, or cruel manner. See L. 1999, ch. 138, § 1. Among the conduct specified by the legislature was the "infliction of mental anguish or physical abuse before the victim's death." K.S.A. 2000 Supp. 21-4636(f)(3).

Defendant argues that Hicks suffered neither mental anguish nor physical abuse. He mistakenly thinks that undisputed evidence is the standard. In defendant's words: "While there was evidence that he was conscious during part of the melee that ensued after the initial blows were struck, there was also evidence that he lost consciousness after the final blow, and did not have a protracted period of suffering and pain." The standard actually applied by this court where the sufficiency of the evidence is challenged for establishing the existence of an aggravating circumstance in a hard 40 sentencing proceeding is "whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence." *State v. Murillo*, 269 Kan. 281, 287-88, 7 P.3d 264 (2000).

The evidence shows that defendant hit Hicks in the head with the claw end of a hammer. The pathologist found wounds from at least eight or nine blows. One of the blows broke Hicks' skull without penetrating his brain; another blow not only broke his skull but also penetrated his brain. Moye testified that Hicks was conscious, crawling on the floor trying to get up after defendant hit him with the hammer. Moye also testified that defendant left the house for a short time, maybe 30 seconds, and then came back in. When the defendant reentered the house, Moye thought defendant was going to help Hicks. Defendant went over to Hicks, who was trying to get up, verbally encouraged him, and started to pick him up under the armpits. Then, according to Moye, defendant looked at Hicks, "clicked again," and hit him in the head with the hammer with even more force than before. Viewing this evidence in a light most favorable to the State, we conclude that a rational factfinder could have found by a preponderance of the evidence that defendant killed Hicks in an especially heinous, atrocious, or cruel manner.

Great risk of death to more than one person. Defendant argues that his killing Hicks posed no risk of death to anyone else until Moye intervened, and, because Moye put himself in harm's way, any risk of death to Moye is not evidence that supports the aggravating circumstance. He relies on *State v. Spain*, 263 Kan. 708, 718, 953 P.2d 1004 (1998).

The question in *Spain* was not whether a bystander's intervention may constitute defendant's knowingly or purposely creating a great risk of death to more than one person. In *Spain*, the issue was whether defendant's kidnapping a man many miles away several hours after killing the jail dispatcher and escaping constituted creating a great risk of death to more than one person within the meaning of the statute. See K.S.A. 2000 Supp. 21-4636(b). We concluded, as a matter of law, that the 21-4636(b) aggravating circumstance "require[d] a direct relationship between creating the great risk of death to another and the homicide. The risk need not be contemporaneous with the homicide, but it must occur in the course of committing the charged murder." 263 Kan. at 718. In the present case, the risk to Moye occurred as he struggled with defendant immediately after defendant struck Hicks for the final time.

The State cites *State v. Vontress*, 266 Kan. 248, 258, 970 P.2d 42 (1998). Vontress entered the house of Tim Anderson and Ethel Spires looking for drugs and money. Anderson and Spires were forced to lie together on the floor. Anderson was shot in the head and killed. Spires was shot in the wrist and the shoulder. Vontress contended that he did not create a great risk of death to Spires for two reasons: He deliberately wounded Spires in such a way as to spare her life, and he did not wound Spires with the same shot that killed Anderson. The court rejected his argument on both grounds:

"Vontress misconstrues the aggravating factor of great risk of death to another person. It is not necessary that the defendant caused another person life-threatening injuries; it is necessary only that the defendant knowingly created a great risk of death to more than one person. The fact that Spires was shot in the shoulder and wrist does not compel the judge to find that Vontress intended to superficially wound Spires rather than place her at risk of death. Spires testified that she covered her head with her hands before she was shot. One bullet entered her wrist and the other entered her shoulder, severing the main artery to her arm.

The position of Spires' hand on her head at the time of the shooting supports the finding Vontress created a great risk of death to Spires.

"Vontress also contends that to find an aggravating circumstance in the fact he created a great risk of death to Spires, it was necessary to find that the shot he fired into Anderson's head also created a great risk of death to Spires. Vontress interprets the law too narrowly. To support a finding that Vontress created a great risk of death to more than one person, there must be a direct relationship between risk of death to Spires and the killing of Anderson. See *Spain*, 263 Kan. at 716. It is not necessary that the same shot that killed Anderson threatened the life of Spires. It is enough that the crime committed created a risk of death for Spires. Clearly, evidence that both victims were shot during the commission of the crimes sustains such a finding in this case." 266 Kan. at 258-59.

Although the facts of *Vontress* differ from those of the present case, *Vontress* provides some guidance. It holds that it is not necessary that the blows that killed Hicks also created a great risk of death to Moye. What is required is a direct relationship between risk of death to Moye and the killing of Hicks.

Here, according to Moye, after defendant already had struck Hicks a number of times, defendant said they were all going to die. Then defendant went out the front door and immediately came back in. He went back to the still conscious Hicks and delivered one more blow with the hammer. The final blow was so forceful that the hammer sank into Hicks' skull. Moye tackled defendant, who had the jammed gun in one hand and the hammer in the other. Moye got the gun away and then found some hair clippers to hit defendant with. The only evidence that defendant expressed any intention of harming anyone other than Hicks was the statement reported by Moye—that they were all going to die. Moye testified that defendant made that statement and then went out the front door. There was evidence that Moye sustained some injuries in the fight with defendant, but no evidence that would show that his injuries were life-threatening or that they were inflicted in a life-threatening manner. The only evidence that defendant may have tried or intended to try to inflict life-threatening injuries on Moye was Moye's testimony that defendant pointed the jammed gun at him.

Defendant argues that the evidence of his pointing the gun at Moye has been discredited by the jury's acquitting him of the

charge of aggravated robbery of Moye. According to defendant, the not guilty verdict shows that the jury did not credit Moye's testimony about defendant's pointing the gun at him and announcing a robbery. There are several reasons, however, why we do not discount Moye's testimony. The first is that the jury's reason for finding defendant not guilty on the aggravated robbery charge may not have been disbelief of Moye's testimony about being threatened with the gun. In addition, in reviewing evidence of aggravating circumstances, the court views all the evidence in the light most favorable to the prosecution.

A review of the court's opinions in hard 40 cases involving the aggravating circumstance of creating a great risk of death to more than one person reveals none with facts like those of the present case. In *State v. Brady*, 261 Kan. 109, 113-17, 929 P.2d 132 (1996), the defendant murdered two people. In *Spain*, 263 Kan. at 718, defendant's act of kidnapping was too remote in time and distance from the murder of the prior victim and did not create a great risk of death to the kidnap victim. In *State v. Perry*, 266 Kan. 224, 233-35, 968 P.2d 674 (1998), defendant shot and killed one person and shot and wounded two other members of the murder victim's family. In *State v. Wakefield*, 267 Kan. 116, 141-43, 977 P.2d 941 (1999), defendant shot and killed two people. In *State v. Hazelton*, 267 Kan. 384, 387-88, 985 P.2d 698 (1999), defendant shot and killed one person and shot and wounded another. In *State v. Jamison*, 269 Kan. 564, 574-75, 7 P.3d 1204 (2000), defendant shot and killed two people. In *State v. Lopez*, 271 Kan. 119, 139-40, 22 P.3d 1040 (2001), defendant, who was in the backseat of an automobile traveling at a normal rate of speed on a well-traveled roadway, shot the driver in the head. Defendant's girlfriend was in the front passenger seat. As the driver fell from the vehicle, it jumped the curb and crashed into a brick building. In *State v. Coleman*, 271 Kan. 733, 741, 26 P.3d 613 (2001), defendant fired shots while driving by a gang rival's house. A young girl, who was crossing the street with a companion, died from a gunshot wound.

In *Allen v. State*, 923 P.2d 613 (Okla. Crim. 1996), the Oklahoma court found that the evidence was insufficient to prove beyond a reasonable doubt that Allen knowingly created a great risk of death

to more than one person. 923 P.2d at 620-21. Allen shot his former girlfriend outside the day care center where she had gone to pick up their young sons. After she fell and Allen was walking away, a day care employee ran to aid the victim. As the worker was about to get the victim into the building, Allen returned. He pushed the worker inside and slammed the door before he pushed the victim down on the outside steps and shot her three times in the back at close range. The court did not believe that the worker, who was inside the building when each of the shots was fired, was placed at great risk of death by defendant's actions. 923 P.2d at 620. The court also rejected the proposition that a police officer, who responded to a 911 call and struggled with Allen, was placed at great risk of death within the meaning of the statute. The court reasoned that "Allen's driving intent to kill [his former girlfriend] ended after he killed her on the day care steps; his attack on Officer Taylor was driven by the independent intent to escape." 923 P.2d at 621.

Death penalty cases from other jurisdictions have very limited precedential value for Kansas' hard 40 sentencing matters. *Spain*, 263 Kan. at 709. However, in the absence of any hard 40 cases with more precedential value, the Oklahoma court's reasoning is worth noting. The Oklahoma day care worker's attempt to help the victim did not put her in contact with the defendant when he was shooting the victim, and the police officer's struggle with the defendant occurred as the defendant was trying to escape. In comparison, Moye testified that he did not attack the defendant while the defendant was attacking Hicks. Moye's attack on defendant occurred after defendant left the house once, returned, and struck the final blow to Hicks' head. Painter's testimony made it seem as if almost no time elapsed between defendant's hitting Hicks and Moye's tackling defendant, but Painter did not indicate that Moye endangered his own life by grabbing defendant. The greatest threat to Moye's safety occurred when defendant pointed the gun at him, which was an act driven by the independent intent of robbery. Moye's fight with defendant and eventual success in pinning defendant to the floor were not shown to involve a great risk of death to Moye. There was no direct relationship between the killing of Hicks and a risk of death to Moye. Thus, we find the evidence

insufficient to establish that defendant created a great risk of death to more than one person.

There remains one aggravating circumstance and one mitigating circumstance. The circumstance of striking the victim some eight or nine times with a claw hammer, some blows delivered while the victim was crawling around on the floor, clearly outweighs the circumstance of no substantial criminal record. The overwhelming disparity between the two circumstances makes remand to the trial court for reweighing unnecessary. We find the facts of this case that the mitigating circumstance does not outweigh the aggravating circumstance.

Affirmed.