No. 88,845

STATE OF KANSAS, *Appellee*, v. JERMANE D. LOWE, *Appellant.*

(80 P.3d 1156)

Opinion filed December 19, 2003.

*Bradley P. Sylvester*, of Wichita, argued the cause and was on the briefs for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

Nuss, J.: This case involves a drive-by shooting which caused the death of a 16-month-old girl. Defendant Jermane Lowe appeals his resultant convictions of felony murder under K.S.A. 21-3401(b) and criminal discharge of a weapon at an occupied dwelling under K.S.A. 2002 Supp. 21-4219(b). He received a life sentence for the felony-murder conviction and a consecutive sentence of 88 months for the firearm conviction. Lowe raises four issues:

1. Whether the district court erred by allowing evidence of Lowe's gang affiliation?
2. Whether the district court erred by failing to give an informant jury instruction?
3. Whether there is sufficient evidence to support his convictions?
4. Whether cumulative district court errors require reversal of his convictions?

Our jurisdiction is under K.S.A. 22-3601(b)(1), conviction of an off-grid crime, and we affirm.

## FACTS

On June 10, 2001, law enforcement officers were surveilling the Club VIP in Wichita. As the club was preparing to close around 2 a.m., a fight began in the parking lot. Members of the "Bloods" gang were fighting each other. Among those present were Michael Walker, Timothy Carr, and Lowe, whom officers identified as gang members. Lowe was specifically identified as having been a member of the "Original Wichita Villain Bloods," a subset of the Bloods.

Shauntelle Thomas, Shawna Johnson, Jendayi Maples, and Tiesha Perry were among the crowd of onlookers at the club. When a group of officers arrived, Walker drove away with Thomas and two other men in a maroon small four-door car. Lowe drove away with Johnson in a silver or gray Cutlass.

Lowe and Walker, with the others, eventually drove to Fairmount Park. Two men then pulled up next to Walker and warned him that he was being followed. Walker and Lowe turned onto a side street, and shortly afterward shots were fired toward their cars. Everyone ducked, and Thomas covered her head. When she risked looking up, she saw a blue Cadillac speeding away. One of Walker's

friends then took Thomas to a hotel room, where she spent the rest of the night. Lowe proceeded in another direction.

Lowe eventually pulled up next to John Hanna at a stoplight and told him that "some fools" had just shot at him and Walker. Hanna had previous ties to the gang with which Lowe was associated, so Lowe asked if Hanna had a gun and if he could ride with Hanna. Hanna interpreted the inquiry as an invitation to join in retaliatory gun fire, not as a request by Lowe to simply borrow his gun. He refused to participate, and Lowe drove away.

Club onlooker Maples arrived at her home around 3:50 a.m., and Walker called Maples on her cell phone as she pulled into the driveway. Maples had known Lowe for 12 or 13 years, so she was able to recognize his voice in the background while she conversed with Walker. She also heard Walker refer to Lowe by name and by his nickname "Little Lowe" and ask Lowe whether he "got the Tec," a semiautomatic firearm. One of the last things she recalled hearing was "that's the house" and then a series of about nine gunshots. Maples heard a car speed away, and the phone line went dead. She became frightened and immediately called Walker back on his cell phone. He assured her everything was fine but his ears were ringing from the shots.

At trial, Maples changed the original story she had told the police and said she "didn't know" who had been talking to Walker in the background. She admitted, however, that she had received death threats from Walker's girlfriend before trial. Officers near the scene confirmed that they heard approximately seven to nine gunshots at about 4:02 a.m.

Shortly after the gunshots, officers found Michael Holt backing his car up Cleveland Street with its headlights off. Holt explained that he was scared because he had just dropped off a friend at his home at the corner of 11th and Cleveland. A small, dark car had passed him on Cleveland and then its headlights went off. The car pulled over, and Holt saw flashes coming out of the car and heard gunshots.

The shots heard by Maples and Holt had been fired into a house at 1032 North Cleveland Street, where Ron Mathis lived with his wife, Dallas Carter, and their children Ron, Shaquella, and 16-

month-old Lexus Mathis. Lexus was mortally shot in the abdomen as she slept on a couch in the living room. Police later found shell casings from three types of cartridges near the curb directly across from the house: 9 mm, .40 caliber and 7.62 mm x 39 mm. Ron Mathis, known as C-Sane, had been involved in a gang, the "Insane Crips," a rival to the Bloods with whom Walker and Lowe were affiliated. Mathis had been a target of such violence in the past.

After the shooting, Walker went to Thomas' hotel room. Lowe and a third man went to Johnson's house, arriving around daybreak. Later that day, Lowe picked up Walker and Thomas at the hotel, made several stops, and then dropped off Walker and Thomas at the car they had ridden in the previous evening, a maroon 1989 Toyota Camry belonging to Scott Shaffer.

Walker had an arrangement with Shaffer; in exchange for the use of the car, Walker would supply him with drugs. When Walker returned the Camry to Shaffer this time, the windshield was damaged from projectiles and the trunk release would no longer latch. Walker told Shaffer he did not know what had caused the damage. Shell casings were found in the car, but latent fingerprints in the car did not match Lowe's, Walker's, or Carr's. One print matched Shaffer's.

Several days after the shooting, Lowe asked Maples to come to his mother's house to help him dispose of some guns. She refused.

Lowe, Walker, Carr, and friend Matthew Hendrix apparently discussed each of their whereabouts "to make sure out of concern that [there] wasn't nobody [sic] near where the incident happened." Lowe advised the others he intended to tell officers he stayed with a woman the entire evening. When he learned that police were looking for him in connection with the shooting, he voluntarily came in to be interviewed. He was *Mirandized* and agreed to speak with the detectives. Lowe told the detectives that he had taken Johnson home from Club VIP after closing and remained at her house until the following morning around 11. He denied any involvement in the shooting.

Lowe was eventually charged with felony murder and criminal discharge of a firearm at an occupied dwelling. Before trial, the State sought to admit gang evidence. The district court granted the

State's motion over Lowe's objection, finding the evidence was relevant for establishing the relationship of the defendant to witnesses and police officers and for explaining Lowe's actions. The court also found that an instruction would be necessary to properly advise the jury that the evidence served a limited purpose.

After Lowe's convictions and the denial of his motions for judgment of acquittal and new trial, this appeal followed.

## ANALYSIS

Issue 1: *Did the district court err by allowing evidence of Lowe's gang affiliation?*

Lowe first argues that the district court erred by admitting evidence of his gang affiliation. Our standard of review on the admission of gang evidence is abuse of discretion. *State v. Valdez*, 266 Kan. 774, 796, 977 P.2d 242 (1999). Discretion is abused only when judicial action is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the district court's view. *State v. Haddock*, 257 Kan. 964, 978, 897 P.2d 152 (1995).

Evidence of gang affiliation indicating a defendant is a member of a gang or is involved in gang-related activity is admissible to show a motive for an otherwise inexplicable act or to show witness bias. *State v. Leitner*, 272 Kan. 398, 414, 34 P.3d 42 (2001). Such evidence, however, is only admissible when there is sufficient proof that such membership or activity is related to the crime charged. *State v. Gholston*, 272 Kan. 601, Syl. ¶ 4, 35 P.3d 868 (2001), *cert. denied* 536 U.S. 963 (2002).

The threshold problem for Lowe is that gang-affiliation evidence was repeatedly admitted without defense objection. While Lowe did object at the pretrial hearings on the State's motion for admission of such evidence and was overruled, he was also required to have made a timely objection at trial in order to preserve the issue for appeal. See *State v. Peckham*, 255 Kan. 310, 327, 875 P.2d 257 (1994). Defense counsel did make a few objections during testimony, including one pertaining to the police surveillance videotape of the Club VIP parking lot based on "lack of foundation." However, there was no trial objection pertaining to the general gang evidence of which Lowe now complains.

Lowe asserts, however, that the general gang evidence presented through police officers' testimony was so prejudicial that this court should disregard the contemporaneous objection requirement and examine the merits of the issue. In particular, he argues that the State tried to damage his character by presenting testimony of police officers who focus on gang crime investigations and that the district court abused its discretion in allowing this evidence. Officer Espinoza testified concerning gang-identification criteria and identified what he labeled as "gang crimes," *i.e.*, "murder, rape, robbery, burglary, . . . [and] aggravated assaults of any kind . . . ." He testified that a gang member "typically will . . . try to put some pressure on people not to testify in the court." Espinoza also testified that "it's very common for [gang members] to just drive by a residence and shoot it up, not caring who's inside." The testimony of Espinoza and other officers suggested that Lowe was associated with the Bloods gang and his friends were also Bloods. Further, the testimony established that the Bloods gang was a rival with the Insane Crips gang, of which the victim's father was a member.

*State v. Tran,* 252 Kan. 494, 847 P.2d 680 (1993), addresses Lowe's argument. There, this court found no abuse of discretion where a gang intelligence police officer testified regarding Wichita gangs and gang activity. Concerning the officer's expert testimony, we said:

"Expert testimony can explain a defendant's actions which might otherwise appear difficult to comprehend. As the Wichita gang intelligence officer, Carey is require to gather information on Wichita gangs and gang-related activity. Officer Carey, in his capacity as gang intelligence officer for SCAT, has accumulated knowledge and information unique to the field of gangs and gang activity. Carey was able to provide the jury with information not generally known regarding gang characteristics and indicia of membership in a specific gang. Carey's testimony had the tendency to prove material facts relating to the events surrounding [the victim's] death." 252 Kan. at 502.

See also *State v. Bowen,* 254 Kan. 618, 622-23, 867 P.2d 1024 (1994) (deputy's testimony about his assignment to a "unit that focuses on drugs and gang activity" was admissible).

Likewise, in the present case, there was no abuse of discretion. According to the prosecution's theory of the case articulated in its brief, the drive-by gunshots into the Mathis home were in retaliation for a rival gang's drive-by gunshots toward Walker and Lowe earlier that morning. Mathis was associated with the rival gang which they believed to be responsible. The witnesses and Lowe were heavily linked by gang membership, and the evidence tended to show that the motive for the crime was gang related, *i.e.*, to explain the otherwise inexplicable. See *Leitner*, 272 Kan. at 414. Accordingly, the gang evidence was clearly relevant and related to the crimes charged. See *Gholston*, 272 Kan. 601, Syl. ¶ 4.

Lowe also contends that this type of testimony violated K.S.A. 60-455 because it was evidence of commission of a crime or other civil wrong. This court has consistently held that evidence of gang membership is not evidence of a crime or civil wrong under that statute. See *State v. Bailey*, 251 Kan. 156, 166, 834 P.2d 342 (1992). Therefore, K.S.A. 60-455 does not apply.

For the small amount of gang-affiliation evidence about which Lowe did object at trial, the district court did not abuse its discretion in admitting it.

Issue 2: *Did the district court err by failing to give an informant jury instruction?*

Lowe also claims that the district court erred by failing to give a jury instruction regarding informants. The pattern instruction, PIK Crim. 3d 52.18-A (2002 Supp.) (Informant), states: "You should consider with caution the testimony of an informant who, in exchange for benefits from the State, acts as an agent for the State in obtaining evidence against a defendant, if that testimony is not supported by other evidence."

Lowe concedes he failed to request such an instruction; therefore, our standard of review is whether failing to give the instruction was clearly erroneous. See K.S.A. 2002 Supp. 22-3414(3). "Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." *State*

*v. Roberson*, 272 Kan. 1143, Syl. ¶ 1, 38 P.3d 715, *cert. denied* 537 U.S. 829 (2002).

Lowe claims that an informant instruction was warranted because Hanna provided information to the detectives only after they agreed not to present Hanna's unrelated case to federal authorities. The State responds that Hanna was not acting as an agent for the State when he talked to Lowe on the night of the shooting and, therefore, was not an informant. The State argues that Hanna had been reluctant to talk to police until their search yielded an AK-47 rifle and ammunition in his house. Thereafter, he agreed to cooperate. Hanna was facing a federal charge which, if convicted, would have resulted in a life sentence. The detectives told him that they would not present his case to the federal prosecutor if he provided information in Lowe's case. However, they made clear to him that they could not guarantee that he would not face federal charges. They also told him he could face State charges.

*State v. Brown*, 272 Kan. 809, 815-16, 37 P.3d 31 (2001), is on point. There, a witness agreed to cooperate with the police in the hopes of receiving some help with his outstanding warrants and refused to give information without some benefit. However, the witness was not acting for the State at the time he gained the information about the murder. Consequently, the witness was not an informant within the meaning of the pattern jury instruction. Therefore, the district court did not err in failing to give an informant instruction. 272 Kan. at 815.

Similarly, under the facts of the instant case, Hanna was not an informant because he was not acting as an agent for the State at the time he gained the information about Lowe. Moreover, even if he had been, the jury heard Hanna state—on both direct and cross-examination—that he was testifying in hopes of avoiding a life sentence on a firearm charge. Thus, the jury was aware of his possible bias. The district court did not commit any error, much less any clear error, in failing to give a jury instruction regarding informants.

Issue 3: *Is there sufficient evidence to support Lowe's convictions?*

Lowe next contends that there was insufficient evidence to support his convictions. He specifically argues that the evidence did

not link him to the crime scene and points to some conflicting evidence in this case. Our standard of review is clear:

"When the sufficiency of the evidence is challenged in a criminal case, the standard is whether, after a review of all the evidence, viewed in a light most favorable to the prosecution, the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. [Citation omitted.]" *State v. Wilkins*, 267 Kan. 355, 365, 985 P.2d 690 (1999).

Moreover, we will not pass upon the credibility of witnesses, conflicting evidence will not be weighed, and all questions of credibility are to be resolved in favor of the State. See *State v. Lyons*, 266 Kan. 591, Syl. ¶ 3, 973 P.2d 794 (1999).

To prove felony murder, the State was required to show that Lowe caused the death of the victim while in the commission of or attempt to commit an inherently dangerous felony. See K.S.A. 21-3401(b). Criminal discharge of a firearm at an occupied dwelling is an inherently dangerous felony. K.S.A. 21-3436(a)(15). To prove this firearm charge, the State was required to show that Lowe maliciously, intentionally, and without authority discharged a firearm at an occupied dwelling, resulting in great bodily harm to a person during the commission thereof. See K.S.A. 2002 Supp. 21-4219(b).

The evidence reveals that less than 2 hours before the drive-by shooting which killed 16-month-old Lexus Mathis in her home, Lowe told Hanna he had just been shot at by "some fools," asked if Hanna had a gun, and asked if he could ride with Hanna. As a former gang member, Hanna took this to be an invitation to participate in a retaliatory shooting, not a request by Lowe to simply borrow his gun. Moreover, Lexus' father and Lowe were associated with rival gangs.

The evidence also reveals that Maples told police she recognized Lowe's voice in the background when she was talking to Walker on his cell phone just minutes before the shooting. Walker also referred to Lowe by his name and nickname and asked whether Lowe got the "Tec," a semiautomatic firearm. Then Maples heard approximately nine gunshots, consistent with the number heard by police officers in the area of the drive-by shooting. When Maples called Walker back, he assured her everything was fine but for the

ringing in his ears from the gunshots. Although at trial Maples claimed she did not know to whom Walker was talking—which was contrary to the earlier story she had provided police—she also admitted she had received death threats from Walker's girlfriend before trial.

Further evidence reveals that several days after the drive-by shooting, Lowe asked Maples to come to his mother's house to help him dispose of some guns. Additionally, his alibi for the shooting was suspect. Lowe told police he spent the entire night with Johnson, but Johnson testified that she drove Lowe's car to her home, and Lowe did not arrive until daybreak.

While Lowe argues no direct evidence placed him at the Mathis home at the time of the crime, we need not address this issue because a conviction of even the gravest offense may be sustained on circumstantial evidence. *State v. Sanders,* 272 Kan. 445, Syl. ¶ 5, 33 P.3d 596 (2001), *cert. denied* 536 U.S. 963 (2002). After a review of all the evidence, viewed in a light most favorable to the prosecution, we are convinced that a rational factfinder could have found Lowe guilty beyond a reasonable doubt of criminal discharge of a firearm at an occupied dwelling and of felony murder.

Issue 4: *Did cumulative district court errors require reversal of Lowe's convictions?*

Finally, Lowe argues that the cumulative effect of all the trial errors he has alleged denied him his right to a fair trial and require a reversal of his convictions. Cumulative trial errors, when considered collectively, may be so great as to require reversal of a defendant's convictions when "the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial." *State v. Lumbrera,* 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 (1992). Since we have found no error concerning any of Lowe's issues, his claim of cumulative error must likewise fail.

Affirmed.