NOT DESIGNATED FOR PUBLICATION

No. 116,477

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DALLAS CLAYBORN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JOHN J. KISNER, JR., judge. Opinion filed November 3, 2017. Affirmed.

*Carl F.A. Maughan*, of Maughan Law Group LC, of Wichita, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., BRUNS, J., and STUTZMAN, S.J.

PER CURIAM:  Dallas Clayborn appeals from his convictions for aggravated robbery and aggravated burglary. He argues on appeal that the State presented insufficient evidence to convict him of the charges and that the district court erred by failing to give either an accomplice or an informant instruction. Based on our review of the evidence in the light most favorable to the State, as we are required to do, we conclude that the State presented sufficient evidence upon which a jury could conclude beyond a reasonable doubt that Clayborn was guilty. Furthermore, we conclude that the district court did not err in instructing the jury. Thus, we affirm.

1

FACTS

On January 13, 2015, Constance Reed and her husband, Ivory Scott, lived with their two grandchildren in a house in Wichita. After Scott and one of the grandchildren went to bed, Reed and the other grandchild were watching television in the living room. Shortly before 10 p.m., Reed heard a noise as three men smashed through the sliding glass door in the kitchen. The three men wore all black clothing and ski masks. Each of them brandished guns.

Scott left his bedroom to investigate the noise. One of the gunmen stopped him and ordered Scott to lay down on the living room floor. The gunmen then ordered Reed and the grandchild who had been watching television with her onto the floor. One of the men bound Scott's legs with duct tape. The men demanded Scott tell them where they could find his wallet, and he complied with their demands. Reed also told the men where they could find her purse. The men left with a significant amount of cash, credit cards, debit cards, medication, and a piggy bank.

Once the gunmen left, Scott and Reed called the police. Officer Phillip Berger and Detective Michael Linnehan of the Wichita Police Department arrived at the house and began collecting evidence. In particular, the officers collected some of the duct tape still attached to Scott's legs as well as a roll of duct tape that did not belong to Scott or Reed. Moreover, Reed told the officers about a recent encounter where she had purchased clothing from Nicole Branch and accidently revealed that she possessed a substantial amount of cash. Scott also gave the officers the account numbers for some of the credit cards that the gunmen had stolen.

A few hours after the break-in, Clayborn, Branch, and two unidentified individuals—one male and one female—went to a Wal-Mart store. A man wearing a black and white jacket attempted to use some of Scott's stolen credit cards to make

2

purchases. Ultimately, the man succeeded in purchasing several items with the stolen credit cards. Shortly afterward, Scott called his bank and learned that someone had used two of his credit cards at an area Wal-Mart. Scott contacted police and gave them the dates and dollar amounts of the transactions.

As part of the investigation, Detective William Crowe, Jr., of the Wichita Police Department, contacted security at the Wal-Mart store. The detective was able to obtain the details of the transactions as well as video footage and still photos of the man who used the stolen credit cards. A few days later, as part of an unrelated matter, Sedgwick County Sheriff's Deputy Michael Guthrie stopped a car for a traffic violation. Branch was the driver, and Clayborn was a passenger in the car. As part of the stop, Deputy Guthrie's vehicle-mounted camera captured a video of Clayborn wearing a black and white jacket similar to the one worn by the man who used the stolen credit cards at the Wal-Mart store.

Upon learning that Branch may have been involved in the break-in at Scott and Reed's house, Detective Crowe reviewed the Wal-Mart security footage. In doing so, the detective identified a woman he believed to be Branch. During the investigation, the detective also discovered that Clayborn was using the same address as Branch. Detective Crowe learned about the traffic stop on January 19 and reviewed a photo taken from the video taken by Deputy Guthrie. The detective noted that the jacket worn by Clayborn during the stop appeared to be the same as the jacket worn by the man in the Wal-Mart security footage who used Scott's credit cards to make purchases.

Detective Crowe had the Sedgwick County Regional Forensic Science Center compare Clayborn's DNA with that of samples on the duct tape roll found during the initial investigation of Scott and Reed's home. On April 21, 2015, Detective Crowe received a report on the comparison of Clayborn's DNA to samples found at the scene of

3

the crime. According to the results, Clayborn's DNA was likely on the duct tape roll found at the scene of the break-in.

On July 2, 2015, the State charged Clayborn with one count of aggravated burglary, in violation of K.S.A. 2014 Supp. 21-5807(b)(c)(3), a severity level 5 person felony, and two counts of aggravated robbery, in violation of K.S.A. 2014 Supp. 21-5420(b)(1), a severity level 3 person felony. On February 9 and 10, 2016, the case went to a two-day jury trial. The State offered the testimony of 13 witnesses and offered over 60 exhibits.

At trial, Scott testified regarding the night of the break-in. He testified that three men broke into the home, without permission, while wielding guns. He further testified that he did not see the faces of the gunmen, but he believed at least one of them to be black, based on the sound of the gunman's voice. According to Scott, the gunmen demanded to know where "the money" was located in the house. He also testified that the men bound his legs with duct tape that one of the gunmen had brought into the house. Scott told the jury that after the gunmen left, he discovered his credit cards and some other items were missing. In addition, he testified that, throughout the encounter, he was scared for the safety of his family and himself. Finally, Scott testified about discovering that two of his cards had been used at a Wal-Mart store a few hours after the break-in.

Reed testified consistent with Scott regarding the events on the night of the break-in. She further testified that she had $1,500 in cash in her purse that she was going to use to purchase a car the next day. According to Reed, the gunmen took the purse with her money when they left the house. Reed then told the jury that she had accidently revealed the existence of the cash in her purse to Branch prior to the robbery. Reed also testified that she informed the police about Branch's possible involvement in the crime.

4

The State also offered the testimony of Laura Meyers, a 911 dispatcher. She confirmed the victims placed a 911 call and laid the foundation for the introduction and publication of a recording of the call into evidence. The recording was also played for the jury. The State then offered the testimony of Officer Berger and Detective Linnehan. The officers explained the initial investigatory steps, including creating an inventory of the lost property and preserving the duct tape remnants and roll for forensic examination. Next, the State offered the testimony of Deputy Guthrie regarding the stop of Branch's car in which Clayborn was a passenger. Furthermore, the deputy laid the foundation for a still photograph taken from the video of the traffic stop that showed Clayborn wearing a black and white jacket.

The State then offered the testimony of Charles Ulrich, a crime scene investigator. Ulrich testified about the methodological approach for gathering forensic samples from a crime scene. The State also offered the testimony of Wal-Mart asset protection employee Kimberly Hamilton. She described the ways that Wal-Mart is able to track down purchases and identified numerous still frames from the security footage on the night of the break-in that depicted a man wearing a black and white jacket using credit cards stolen from Scott to make purchases.

On the second day of the trial, the State offered the testimony of Detective David Alexander. Detective Alexander described the process for acquiring a DNA sample from an individual. In addition, Detective Alexander testified that he acquired a DNA sample from Clayborn. Next, the State called Detective Crowe to testify regarding his investigative process and the results of his investigation of this crime. The State also offered the testimony of two forensic scientists who described the process for comparing DNA samples located at a crime scene with those from known sources. Moreover, Dr. Shelly Steadman also testified that Clayborn could not be excluded as the source of the sample on the duct tape roll, and that the chance that a random DNA profile would also be consistent with the duct tape sample was 1 in 227 quadrillion.

5

Finally, the State offered the testimony of Branch. She testified about her relationship with Reed and with Clayborn. She admitted that she was with Clayborn at the Wal-Mart when he used the stolen credit cards. Branch also testified that Clayborn admitted to her that he had committed a robbery in a manner consistent with the break-in at Scott and Reed's house. Furthermore, she admitted that she was testifying as part of a plea agreement.

Clayborn exercised his right not to testify at trial and offered no evidence in support of his defense. Likewise, Clayborn did not object to any of the jury instructions given by the district court. After deliberations, the jury returned a guilty verdict on all of the charges. On March 30, 2016, Clayborn filed a motion for a new trial and for judgment of acquittal. The district court denied the motion and sentenced Clayborn to a controlling prison term of 308 months of prison time with 36 months of postrelease supervision.

ANALYSIS

*Sufficiency of the Evidence*

On appeal, Clayborn challenges the sufficiency of the evidence for his aggravated robbery convictions and his aggravated burglary conviction. Specifically, Clayborn argues that the State only established that he was associated with the people who committed the crimes and failed to prove that he actually participated in the crimes. He also argues that even if there was sufficient evidence to lead the jury to assume that he committed the crimes, the evidence was not sufficient to convict him of aggravated robbery and aggravated burglary beyond a reasonable doubt.

"'When the sufficiency of evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citation

6

omitted.]" *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). See also *In re J.A.B.*, 31 Kan. App. 2d 1017, 1022, 77 P.3d 156, *rev. denied* 277 Kan. 924 (2003) (standard for juvenile offender adjudications). "'In making a sufficiency determination, the appellate court does not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility. [Citations omitted.]'" *State v. Dunn*, 304 Kan. 773, 822, 375 P.3d 332 (2016). It is only in rare cases where the testimony is so incredible that no reasonable factfinder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

To convict Clayborn on the aggravated robbery charges, the State needed to prove beyond a reasonable doubt:

- that Clayborn knowingly took property from Scott and Reed;
- that the taking was by force or by threat of bodily harm;
- that Clayborn was armed with a dangerous weapon or inflicted bodily harm on any person in the course of the robbery; and
- that the robbery occurred in Sedgwick County, Kansas.

K.S.A. 2014 Supp. 21-5420(b); PIK Crim. 4th 54.410 (2016 Supp.).

Moreover, to convict Clayborn on the aggravated burglary charge, the State needed to prove beyond a reasonable doubt:

- that Clayborn entered Scott and Reed's home;
- that he did so without authority;
- that he did so with the intent to commit a felony;
- that he did so while there were people in the home; and
- that the act was committed in Sedgwick County, Kansas.

7

K.S.A. 2014 Supp. 21-5807(b); PIK Crim. 4th 58.130 (2016 Supp.)

Based on our review of the record in the light most favorable to the State, we conclude that sufficient evidence was presented upon which the jury could convict Clayborn of each of the charges beyond a reasonable doubt. It is important to recognize that a verdict may be supported by circumstantial evidence if such evidence provides a basis for a reasonable inference by the fact-finder regarding the fact in issue. Furthermore, circumstantial evidence need not exclude every other reasonable conclusion in order to be sufficient. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016).

"'Circumstantial evidence tends to prove a fact in issue by proving other events or circumstances which afford a basis for reasonable inference by the jury of the occurrence of the fact in issue.' [Citations omitted.]" *State v. Evans*, 275 Kan. 95, 105, 62 P.3d 220 (2003). A conviction of even the gravest offense can be based entirely on circumstantial evidence. *Logsdon*, 304 Kan. at 25. Here, we find that the State presented sufficient evidence—albeit circumstantial—to allow the jury to make reasonable inferences that Clayborn was one of the men who broke into Scott and Reed's house with the intent to steal money.

The State offered the testimony of 13 witnesses and introduced 71 exhibits at trial to tie the events together. Specifically, the State offered the testimony of Scott and Reed to prove that on the night of January 13, 2015, three armed men broke into their home through a sliding glass door without permission. The intruders pointed guns at Scott and Reed, forcing them to lay on the floor and demanding to know where they kept "the money" in the house. One of the intruders brought duct tape with him and used it to bind Scott's legs during the break-in.

Reed further testified that she had accidentally revealed a large sum of cash to Branch shorty before the break-in. The police were subsequently able to link Branch to

8

Clayborn. Moreover, Branch testified at trial that Clayborn told her that he had been involved in an incident similar to the break-in at Scott and Reed's house. In addition, the Sedgwick County Regional Forensic Science Center tested a DNA sample collected from the duct tape used to bind Scott's legs during the break-in and compared it to Clayborn's known DNA. According to Dr. Steadman, "[t]he probability of selecting an unrelated individual at random who exhibits the matching DNA profile with the profile from [the duct tape] is approximately 1 in 2 and 27 quadrillion." Put another way, the chance that the DNA came from a random individual and not Clayborn was exceedingly low.

The State also presented evidence that multiple credit cards stolen from Scott were used at a Wal-Mart store within a few hours after the break-in. The State played the Wal-Mart security camera footage for the jury, showing a man wearing a black and white jacket making purchases with the stolen credit cards. In addition, the State presented evidence to show that the man using the stolen credit cards was with a female. Detective Crowe testified that he believed Branch to be the woman shown in the Wal-Mart security footage. Furthermore, Branch testified that she went to Wal-Mart with Clayborn, and he used credit cards associated with Reed to make purchases.

Officer Guthrie testified that a few days after the break-in, he conducted a traffic stop of a vehicle driven by Branch in which Clayborn was a passenger. Branch indicated that she was in a romantic relationship with Clayborn. The State also offered photographs from the traffic stop that showed Clayborn wearing a black and white jacket similar to the one worn by the man who had made purchases at Wal-Mart using Scott's stolen credit cards.

Branch testified about her relationship with Clayborn. She also testified that Clayborn told her, after the trip to Wal-Mart, that he and two others had robbed a house with a woman, a man, and a child in it. According to Branch, Clayborn told her that he and the others broke in through a sliding door. Significantly, Branch identified both

9

Clayborn and herself in the photos taken from the Wal-Mart security footage. In particular, she confirmed that Clayborn was the man wearing the black and white coat. She further testified that Clayborn paid for the goods at Wal-Mart with a stolen credit card he got from Reed's house.

This testimony, if believed, combined with the exhibits admitted into evidence was sufficient to prove beyond a reasonable doubt each of the elements of aggravated robbery and aggravated burglary. Although Clayton offers numerous alternate explanations about how the jury should have viewed the evidence, it is not our role to weigh the evidence or to determine the credibility of the witnesses. Instead, this is the role of the jury.

*Jury Instructions*

Clayborn also contends that the district court erred by failing to give certain instructions to the jury. We review this issue utilizing a three-step process: (1) we determine whether the issue was preserved for appeal; (2) we consider the merits to determine whether an error occurred; and (3) we assess whether the error was harmless or requires reversal. *State v. Pfannenstiel*, 302 Kan. 747, 752, 357 P.3d 877 (2015). As Clayborn candidly admits, he did not raise an objection to the jury instructions given by the district court, nor did he request that the district court give the additional instructions. As such, we must determine if the district court's failure to give an accomplice instruction was clearly erroneous. Furthermore, Clayborn has the burden to establish clear error. See K.S.A. 2016 Supp. 22-3414(3); *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014).

In determining if there has been clear error, we review the impact of the entire record—including the instructions that the district court actually gave. *In re Care & Treatment of Thomas*, 301 Kan. 841, 849, 348 P.3d 576 (2015). To meet his burden,

Clayborn must "'firmly convince [us] that the giving of the instruction would have made a difference in the verdict.' [Citation omitted.]" *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016). Based on our review of the record on appeal, we do not find that the district court committed an instructional error—much less one that would have made a difference in the verdict rendered by the jury.

For the first time on appeal, Clayborn argues that the district court should have given an instruction to the jury based on PIK Crim. 4th 51.090 (2014 Supp.), which reads:

"An accomplice witness is one who testifies that (he) (she) was involved in the commission of the crime with which the defendant is charged. You should consider with caution the testimony of an accomplice."

Specifically, Clayborn argues that, because Branch was with him at Wal-Mart when the stolen credit cards were used, she was an accomplice witness. However, there is nothing in the record tending to show that Branch was involved in either the aggravated robberies or the aggravated burglary. Moreover, the evidence presented at trial suggests that Clayborn was the only one using the stolen credit cards. Although there is evidence in the record to suggest that Branch may have told Clayborn that Reed had a large sum of cash, there was no evidence to suggest that she helped plan or otherwise participate in the break-in. Rather, Branch testified that Clayborn told her about the break-in after it occurred. Accordingly, because nothing in the record indicates Branch "was involved in the commission of the crime with which [Clayborn] is charged," we conclude that the district court did not err by failing to give an accomplice instruction to the jury.

Clayborn also argues that the district court should have given an instruction to the jury based on PIK Crim. 4th 51.100 (2013 Supp.), which reads:

11

"You should consider with caution the testimony of an informant who, in exchange for benefits from the State, acts as an agent for the State in obtaining evidence against a defendant, if that testimony is not supported by other evidence."

Unless a witness was acting as an agent for the State at the time he or she obtained the information about a defendant's involvement in a crime, a PIK Crim. 4th 51.100 instruction is not necessary. *State v. Lowe*, 276 Kan. 957, 963-64, 80 P.3d 1156 (2003). Here, there is nothing in the record on appeal to suggest that Branch was acting as an agent on behalf of the State prior to, during, or after the break-in. Moreover, Branch's testimony was supported by other evidence, and the jury was aware that she was testifying pursuant to a plea agreement. Thus, we conclude that it was not erroneous for the district court to not give an informant instruction.

Affirmed.